```
1              IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
2
                    FORT LAUDERDALE DIVISION
3
                  CASE NO.:  20-cv-61469-RS
4

5

6

7  AKAI CUSTOM GUNS, a Florida    )
   Limited Liability Company,     )
8  LLC, et al.,                   )
                                  )
9              Plaintiffs,        )         July 28, 2022
                                  )
10                                )
   KKM PRECISION, INC., et al.,   )
11 A Nevada Corporation,          )
                                  )         Pages 1 - 108
12             Defendants.        )
   _____ /
13

14

15

16              DISCOVERY PROCEEDINGS

17         BEFORE THE HONORABLE ALICIA O. VALLE
              UNITED STATES MAGISTRATE JUDGE
18

19

20
   APPEARANCES:
21

22 On behalf of the Plaintiff for Akai Custom Guns:

23              MCKELVIE, MCKELVIE, YEE AND EPACS, P.C.
                280 West Maple Road,
24              Suite 220
                Birmingham, MI 48009.
25              BY:  EDMUND S. YEE, ESQ.
                BY:  RICHARD FIATO, ESQ.
```

1

2  APPEARANCES CONTINUED:

3

   On behalf of Defendant KKM:

4

5                    ZIMMERMAN KISER & SUTCLIFF
                     315 East Robinson Street
                     Suite 600,
6                    Orlando, FL 32801
                     BY:  NICOLAS J. MARI, ESQ.

7

8

9

   On behalf of Defendant SCI:

10

11                   BENFORD LAW FIRM, P.A.
                     1065 West Morse Boulevard
                     Suite 101,
12                   Orlando, FL 32789
                     BY:  JOHN Y. BENFORD, ESQ.

13

14

15

   Transcribed By:

16

17                   BONNIE JOY LEWIS, R.P.R.
                     7001 SW 13 Street
                     Pembroke Pines, FL  33023
18                   954-985-8875
                     caselawrptg@gmail.com

19

20

21

22

23

24

25

1        (Thereupon, following proceedings were held:)

2        THE COURT:  Good afternoon everyone.

3        Thank you for calling into this telephonic motion

4  hearing.  If I could please call the case Akai Custom Guns LLC,

5  et al. versus KKM Precision, et al.; Case Number 20-cv-61469.

6  This case is assigned to District Judge Smith and he has

7  referred the motions to me for consideration.

8        So if I could please have everyone's appearance on the

9  record beginning with Plaintiffs' counsel.

10        MR. YEE:  Good afternoon, Your Honor.

11        Edmund Yee appearing on behalf of Plaintiffs.

12        MR. FIATO:  Good afternoon, Your Honor.  Richard Fiato

13  appearing on behalf of the Plaintiffs.

14        MR. MARI:  Good afternoon, Your Honor.  Nicolas Mari

15  on behalf of Defendant KKM Precision.

16        MR. BENFORD:  Good afternoon, Your Honor.

17        John Benford of with Wilson Elser Moskowitz Edelman

18  and Dicker co-counsel for Defendant Shooters Connection, Inc.

19        THE COURT:  Right.  Thank you everyone for calling in

20  this afternoon.

21        Before getting started, I just want to go over a

22  couple of preliminary matters of really the technology that we

23  are using.

24        First of all, when you speak, it is important that you

25  please state your name and that is helpful to me since I am not

1    seeing you so I know who is speaking.  But it is also important

2    if at any point you need a transcript of these proceedings

3    whoever is transcribing it will know who the speaker is.

4          Also, I would ask that you speak a little slower than

5    you normally would because sometimes I note there is a little

6    bit of a time lag when you use this system.

7          So if you speak too quickly the sentence at the end

8    will be garbled and jumbled and so it is best that we slow down

9    a little bit.  In addition that helps when we're speaking over

10   one another.

11         As you can tell the proceedings are being recorded and

12   there is no live court reporter taking things down.  So these

13   measures are important.  As I said before, to assure an

14   accurate recording and, of course, an accurate transcript if

15   you later need one of these proceedings.

16         To this end, I am going to ask that you please mute

17   your phone, whether it is a cell phone or a landline when you

18   are not speaking.  This avoids a lot of background noise and

19   interference that we sometimes get during our telephonic

20   conferences.

21         Importantly and finally, if you get disconnected, all

22   you have to do is call back to the number that you called into

23   now.  As I explained when we were off the record in terms of

24   the technology, I have a conference monitor screen in front of

25   me and in that screen I now have your names.

1          If you get dropped off the call I will know that you

2     got dropped off in one of two ways.  First, I will hear a

3     little alarm, a little bell that goes off that alerts me to the

4     fact that someone has either entered or left the conference

5     call, or I may also see the fact that your name is going to

6     drop off my screen.

7          If either of those happen, I will know that you are

8     not with us and we will wait for you to call back.  So that's

9     just it in terms of the technology.  Nothing too complicated.

10          We are here this afternoon on four motions.  The first

11     is Plaintiff's motion to compel complete answers to Plaintiffs'

12     first request for production of documents from Defendant KKM.

13     That's at ECF 80.

14          The second motion is Plaintiffs' motion to compel

15     accurate answers to Plaintiffs' second request for admissions

16     and to Plaintiffs' first, second, and third request for

17     production to Defendant KKM, or in the alternative, to deem

18     certain matters admitted.  And that was at ECF number 86.

19          The next motion is Defendant SCI's motion for relief

20     from Plaintiffs' claim of technical admissions and that's at

21     ECF number 88.

22          And lastly, we've got Plaintiffs' motion to deem

23     matters admitted, or in the alternative, compel accurate

24     answers to the second request for admission and that's at ECF

25     on number 90.  And these are the second requests for admissions

1   to SCI.

2        I would note that 88, which is Defendant SCI's motion

3   was the first request for admission.  Number 90 deals with the

4   second request for admission and that's at, as I said, at ECF

5   90.

6        The joint status report was filed for each of these

7   motions at ECF number 95.  That was filed July 21st and,

8   unfortunately, it indicates that the motion by and large

9   remains in dispute.

10       Before proceeding and to hear argument from the

11  parties, what I would like to do is just offer some background

12  on the case.  If anything I say is incorrect, please let me

13  know.

14       I have tried to make myself as familiar as I could

15  with the issues so that I could rule on these matters.  And

16  then, I will also just review some of the upcoming deadlines to

17  make sure that we are all on the same page regarding the status

18  of the case.

19       Basically, I think relevant here in preparing for

20  today I did read ECF number 56, which was the Court's order on

21  the Defendants' joint motion to dismiss that gave a good

22  background of the proceedings to that date and, of course, that

23  was dated September 27th of 2021.

24       After the joint motion the order was entered on the

25  motion to dismiss, Defendants KKM and SCI both answered and

 1  started affirmative defenses to the complaint.

 2          Relevant here, what we have is ECF number 72, which is

 3  the Court's second amended scheduling order that was entered

 4  March 15th of this year.  And in that second amended scheduling

 5  order we have a fact scheduling deadline of August 30th, which

 6  is literally a month away.

 7          Dispositive motion deadline is September 13th.

 8  Calendar call is February 7th and the trial date of

 9  February 13th.  So that's all the background and the time

10  constraints under which we will be operating as I rule on these

11  motions.

12          Before, again, turning -- I don't want you to spend a

13  lot of time educating me on the claims.  I understand that the

14  matter involved claims by Plaintiffs Akai Custom Guns and Mr.

15  Horowitz against the Defendants SCI and KKM.

16          And the complaint alleges that the Defendants violated

17  Florida Statute 817.41 misleading advertising.  As well as

18  FDUPTA fraudulent inducement and breach of express and implied

19  warranty resulting from the purportedly misleading advertising

20  and sale of KKM pistol barrel KKM to SCI and some directly from

21  KKM.

22          According to the Plaintiff, the Defendant KKM

23  advertised that all KKM barrels were made using a certified

24  416-R gun barrel quality stainless steel bar stock that are

25  heat treated and vacuum tempered to a rock hardness of 42-RC.

1        However, Plaintiff claims that none of the bars that

2   were manufactured and sold by KKM and SCI were made from this

3   steel 416-R steel and that many of these barrels were not heat

4   treated and vacuum tempered to the required 42-RC and that SCI

5   and KKM knew it, but did not disclose it to the public or to

6   the Plaintiffs.

7        According to the Plaintiffs, these barrels failed to

8   the specifications.  It did not meet the specifications and

9   they failed in operation and in testing resulting in damages to

10  the Plaintiffs.

11       Plaintiffs also assert a number of counts against the

12  Defendants for defamation, defamation *per se*, defamation by

13  implication, commercial disparagement and civil conspiracy to

14  commit commercial disparagement.  So that's my understanding of

15  the case in a nutshell.

16       In preparation for today's hearing I have reviewed the

17  docket.  As you could see, I have read the order on the motion

18  for summary judgment.  I have obviously read the respective

19  motions at issue for today and the relevant JSR.

20       So what I would like to do going forward now is I am

21  going to allow each side 20 minutes to argue.  I am also going

22  to give the proponent of the motion an extra five minutes for

23  rebuttal.  I will hear from Plaintiffs first and what we will

24  do is we will handle all of Plaintiffs' motions first in the

25  20 minutes and, then, I will turn to the Defense for its

1  response.

2       Please do not interrupt each other.  If you have a

3  comment to make or if you think your opposing counsel has made

4  a misstatement, or an incorrect statement, or whatever, just

5  make a note of it and you can bring it up when it is your turn

6  to argue.  I do not want this to turn into a Ping-Pong match

7  back and forth.

8       It is inefficient and it really doesn't help me to

9  shed light on the issues.  So if you have a point to make, when

10 it is your turn to speak, you will have an opportunity to do

11 so.

12      Please know that I will be asking you questions.  I

13 think that is the best way for me to get to the bottom of what

14 I am interested in.  If that happens and you feel that you need

15 extra time to finish making a particular point that I prevented

16 you from getting to, please let me know.

17      I am flexible.  I just like to have some semblance of

18 control over the timing.  So we will start with 20 minutes per

19 side and five minutes for rebuttal for who whoever is bringing

20 the motion.

21      So with that said, let me get out the motions.  I

22 guess the way I would like to proceed, let's leave the Defense

23 SCI request for relief at ECF 88 to last.  That makes more

24 sense.  So that I will hear first from Plaintiffs on the motion

25 that I just described, 80, 86, and I believe it is 90; 80, 86,

1 | and 90.

2 | Who is going to be arguing for Plaintiffs?

3 | MR. YEE:  Your Honor, this is Attorney Yee.  I will be

4 | the primary presenter for Plaintiffs.

5 | THE COURT:  Okay.  All right.  So let's start.  As

6 | soon as I find all these papers I will start my timer of

7 | 20 minutes and, then, I will give you five minutes for

8 | rebuttal.

9 | All right.  You may begin, Mr. Yee.

10 | MR. YEE:  Thank you, Your Honor.

11 | Your Honor, as you probably are well aware and I was

12 | recently involved -- not aware of this, but I was involved in

13 | another case here in Michigan in another federal case in which

14 | a magistrate eloquently pointed out that a lawsuit is a search

15 | for the truth and in this particular case it is no different.

16 | As you mentioned you understand the background of what

17 | is going on here of what the Plaintiffs' claims are and

18 | Plaintiffs' counsel, Mr. Fiato and I, are simply trying to

19 | search for the truth.  We have sent a number of discovery

20 | requests to Defendants and we have received responses that have

21 | been evasive and inaccurate.

22 | For instance, in our first motions to compel it was

23 | prompted because of the documents that were produced by

24 | Defendant KKM, they were Bates labeled KKM 000001 through

25 | 000167.  So as produced to date, Your Honor, a total of

1  167 pages which is in comparison with what Plaintiffs have

2  produced to date we have produced over thousand pages of

3  discovery documents.

4       Regarding the pages that have been produced, 96 of the

5  pages Bates labeled 72 to 167 are nothing more than fragments

6  of the KKM website and it relates primarily to their frequently

7  asked questions section of the website.

8       We had asked for information from KKM as to what they

9  advertised and published to the public as to what their barrels

10  are made from, which you mentioned earlier, we were informed

11  that they were made 416-R gun barrel quality steel.  And when

12  we asked them to produce their advertising they gave us

13  96 pages of fragments of their website that really shed no

14  light on anything.

15       If my math is correct, then, KKM to date has only

16  produced 71 pages of information that is useful in some

17  fashion, but even with the 71 pages that they have produced, a

18  lot of it is duplicative.  So it is actually less than that and

19  again it pales in comparison to what the Plaintiffs produced to

20  date.  And for cross reference, Defendant SCI has produced over

21  1800 pages of documents.

22       In our request to compel production of documents first

23  motion, for instance, we asked for information like testing

24  results.  KKM asserts that although they tested certain barrels

25  that they did not photograph or print the results, it is our

1   understanding in our research that the machine that they used

2   to test the barrels is an innovative test machine that they

3   use.  It is normally interfaced with a computer or a laptop,

4   which stores the information, but yet they have not produced

5   any of that information.

6          We have also asked for information regarding any

7   barrels that were returned to them for any reason, presumably,

8   as a result of any claims of problems.  And we have received

9   information through subpoena from a third patient named Keeley

10  Custom Gun Works that indicates that they actually returned

11  barrel KKM and those barrels were replaced, but KKM has not

12  produced any of those communications or results.

13         We also asked for documents relating to the process

14  and requirements of the heat treating with their outside heat

15  treater and Nevada Heat Treating.  All KKM has produced is a

16  spreadsheet of information of test results, but there is no

17  cross reference information as to what barrels they are.

18         What I will get into later, Your Honor, it is our

19  understanding that KKM through discovery purchased these

20  barrels from two different suppliers, or manufacturers, I

21  should say.

22         And they indicate that that's all that they have, but

23  they produced a document from Nevada Heat Treating that clearly

24  says that the information or background supporting that

25  spreadsheet data is available upon request, but yet KKM has

 1 | failed to make that request.

 2 | THE COURT:  Mr. Yee, I thought I read in one of the

 3 | later filings that Defendant KKM has agreed and cited a

 4 | suggestion to request the testing results from Nevada Heat; is

 5 | that incorrect?

 6 | MR. YEE:  They did indicate that they would do that.

 7 | That was in an oral conversation with Mr. Robinson who is the

 8 | attorney on the pleadings.  Mr. Mari is in place for Mr.

 9 | Robinson today.  Mr. Robinson did tell us over the telephone

10 | that he would do that, but to date we have not seen those

11 | documents.

12 | THE COURT:  Okay.  But I saw that in writing in one of

13 | the responses.  Otherwise I wouldn't know it.

14 | So my question to you is assuming that KKM does that

15 | and reaches out to Nevada and provides the document that you

16 | seek, as it says in its written submission that it will, does

17 | that moot your request or does that solve the request?

18 | MR. YEE:  It would moot the request.

19 | However, as you noted earlier, the end of fact

20 | discovery ends on August 30th, which is right around the

21 | corner, which really puts us behind the eight-ball in that

22 | we've been asking for this information for quite some time and

23 | still haven't received it.  So that's why we felt that a motion

24 | to compel, an order compelling for a certain date was

25 | necessary.

1        I mean an agreement to produce it is great, but yet we

2   haven't seen it and now we have a discovery cutoff right around

3   the corner.

4        THE COURT:  Right.

5        MR. YEE:  And it makes it very different for us to

6   prepare our case.

7        THE COURT:  Let's do this.  I understand your overall

8   argument.  Let's go quickly over the particular request that

9   you are moving to compel ECF 95 Pages 1 through 18.  That's the

10  first motion; ECF number 80.  And then, let me see if I have

11  any specific questions to ask you on that.

12       Now with reference to request for production number

13  one, the way I read it, is you are asking to test the actual

14  barrel, correct?

15       MR. YEE:  Correct.  And their response is that they

16  didn't save the test results from their test equipment.  So

17  we're asking for the barrels.  They identify an Akai Thompson

18  Sleeve barrel that they received from somewhere somehow.  So

19  they obviously have that barrel, but they have not agreed to

20  produce that barrel for testing.

21       They mention a joint testing protocol, which is true.

22  All Defense counsel had a joint Zoom conference back in May of

23  2021 where Defense expert would contact Plaintiffs expert to

24  discuss a joint testing protocol.  The Defense expert did not

25  reach out to Plaintiffs' expert until October of 2021 and there

1   have been promises of joint testing protocol, but that has not

2   happened and that's why there has not been any exchange of

3   barrels.

4          They indicate that they have not been able to prepare

5   their case because we haven't produced our barrels, but yet

6   we've been waiting for a joint testing protocol that has been

7   discussed since May of 2021 that still has not come to

8   fruition.

9          THE COURT:  Give me one second.  The other question I

10  have not asked you about was Nevada.  I'm just making notes of

11  things that --

12         MR. YEE:  Sure.

13         THE COURT:  -- could be produced, but have not yet

14  been produced.

15         So let me ask you this.  This joint testing protocol

16  that you reference there, I read in one of Defendants'

17  responses to one of your motions, I forget which because there

18  were a lot, exactly what you just said.

19         I guess that's what you are call them the joint

20  testing protocol that they are willing to give you whatever

21  barrels they have if you let them see and inspect whatever

22  barrels you have held back; is that correct?

23         MR. YEE:  Correct.

24         THE COURT:  That's the joint testing protocol?

25         MR. YEE:  Correct .  It's a protocol that sets forth

1  how the two experts were jointly pass so there is no arguments

2  or issues over spoliation of evidence is primarily the goal

3  behind the joint testing protocol.

4        THE COURT:  Okay.  All right.  So here that's what you

5  are looking for.  That's number one.  Basically this particular

6  request could be resolved with a joint testing protocol,

7  correct?

8        MR. YEE:  Joint testing protocol and then production

9  in a joint fashion of the barrels that each other hold for

10 testing, correct.

11       THE COURT:  Right.  Okay.  That doesn't sound to me

12 that it should be insurmountable, but let me see.

13       Let's go to the next one.  Although, of course

14 Defendant says in its response at ECF 83 that a lot of its

15 barrels have been returned to the customers.  Of course, there

16 is nothing that you can do about that, correct?

17       MR. YEE:  Correct.  If they truly have returned

18 barrels to their rightful owners they wouldn't have those

19 barrels, but they identified an Akai Thompson Sleeve barrel

20 that failed.

21       And I believe they produced a picture of it and the

22 barrel completely exploded.  So I don't know if that barrel

23 would have been returned.  It appears to me they would have

24 held out on that because it appears that there were some tests

25 done by KKM on that barrel.

1          THE COURT:  Okay.  Give me one second and then we can

2    go on to the next one.  The next one is request number three.

3    You are asking for communication regarding barrels that were

4    returned.  And their response is?

5          MR. YEE:  That they didn't save the test results, they

6    didn't print them, or they didn't photograph them.

7          THE COURT:  Right.  And then, at the very end, it says

8    in proponent's position that KKM has searched its records for

9    any communication and has no located any responsive documents.

10          So if, in fact, that's the answer -- I mean, you can't

11   get blood from a rock.  So if it doesn't exist, it doesn't

12   exist.

13          MR. YEE:  The concern with that, Your Honor, is

14   Defendant SCI produced in their production and it is Bates

15   labeled SCI 1838.  It is e-mails between Charles Bradley, who

16   is the president of Shooters Connection, with Luke McIntyre who

17   I understand is the president of KKM.

18          Where they discussed a failed barrel belonging to a

19   one Gerry Collatione (phonetic).  So this is an e-mail that is

20   between Mr. Bradley McIntyre that exists and it was back in

21   January 21st of 2020.  Shooters Connection has this e-mail, but

22   yet KKM asserts that they have no communications relating to

23   any out of spec barrels.

24          THE COURT:  Right.  I think one of the answers that I

25   saw later on is that they say Mr. McIntyre no longer has that

1    phone.

2           MR. YEE:  Well, that's referring to a specific text

3    message between Mr. McIntyre and a nonparty named Nathan Carter

4    in December of 2019 before the lawsuit was filed and we wanted

5    the whole text communication.

6           And it is Mr. McIntyre's position that he no longer

7    has that phone, but we find that response to be insincere

8    because we discovered that in October of 2021 -- again, e-mail

9    exchanges between Mr. Bradley and Mr. McIntyre.

10          Mr. McIntyre provides that whole -- more than just

11   that snippet that we attach as an exhibit to our complaint.  He

12   attaches the communications with Mr. Carter to Mr. Bradley.  So

13   as of October 21, Mr. McIntyre still had that communication

14   stored somewhere.

15          And not having the phone, Your Honor, if you have ever

16   replaced your phone, you know that typically when you restart a

17   new phone, most of your text messages and e-mails get pulled in

18   from your old phone into the Cloud into your new phone.  So to

19   simply say that I can't get them because I don't have the

20   phone, I don't know that that's a sincere response.

21          And quite frankly, Your Honor, back in July of 2020

22   shortly after the lawsuit was filed and then moved to federal

23   court, we sent notice to Mr. Robinson's office demanding that

24   they preserve all evidence.  So for Mr. McIntyre to have gotten

25   rid of the phone would be in violation of that notice to

1 | preserve evidence.

2 |       THE COURT:  All right.  I understand what you are

3 | saying.  However, just to be clear, because I think I saw this

4 | message that you refer to that was attached to an exhibit.  It

5 | was pretty hard to read, but I was able to make it out.  So you

6 | do have it, in any event?

7 |       MR. YEE:  There's more to it.  That's just one of the

8 | texts in a chain of texts, correct.

9 |       THE COURT:  But the text that you refer that was Mr.

10 | McIntyre, or whoever it was, you do have from SCI?

11 |       MR. YEE:  Correct.

12 |       THE COURT:  All right.  So those communications

13 | regarding barrels that were returned.

14 |       The next one is request number 4; documents or

15 | communications regarding products that were recalled and then

16 | returned as a result of a recall.

17 |       Their answer seems to be at the end of the day that

18 | they had never had a recall.

19 |       You would agree with me that a recall is different

20 | than a customer return, correct?

21 |       MR. YEE:  Correct.  We called it a recall because we

22 | were informed that other vendors that we identify such as Venom

23 | Custom and Keeley, who actually is not identified in the joint

24 | status report here, but we understand that those two entities,

25 | in fact, returned barrels to KKM and they were replaced.

1      THE COURT:  Right.  And that's a return.  And I think
2  you called, among your requests, called it a return, but this
3  one in particular uses recall.  Like, for example, Plaintiffs
4  did a recall of its guns, correct?
5      MR. YEE:  Correct.
6      THE COURT:  Right.  So it seems to me that that could
7  be part -- I mean, I think there is a difference between a
8  return and a product that is recalled.  If a customer is
9  returning a product because they are just dissatisfied for
10  whatever reason, absent a recall, I don't necessarily think
11  that falls within the ambit of this request.
12      Would you agree with that?
13      MR. YEE:  I would agree with that.
14      THE COURT:  Okay.  So I'm going to highlight recall
15  and then we'll talk some more with the Plaintiffs about that.
16      Now in the second amended response, I just made a note
17  of this, in the second amended response Defendant says there
18  are none.  So if that's true, then there's very little else to
19  do on this interrogatory, correct?
20      MR. YEE:  Correct.
21      THE COURT:  And obviously, I don't have a crystal ball
22  and I can't put them under a polygraph if they're representing
23  to the Court that they have never had any recalls, we're going
24  to take them at their word.
25      And if you find otherwise during discovery I am sure

1  they will be hearing about it either through a motion for

2  sanctions, or through cross-examination, or whatever

3  appropriate means, correct?

4       MR. YEE:  Correct.

5       THE COURT:  Now number 5, this one talks about test

6  results of barrels that were returned, right?

7       MR. YEE:  Correct.

8       THE COURT:  And Defendant says that a test of the

9  Venom Custom Guns was done, but there are no records and KKM to

10 Venom Custom was oral.  So no documents exist.

11      MR. YEE:  Right.  And as I asserted earlier, Your

12 Honor, my understanding is that the machine that they use is

13 connected to a computer that stores the results.

14      THE COURT:  All right.  And we'll ask the Defendants

15 about that.  I'm making a note about that.

16       So they're saying they have no test results at all.

17 The second part of the answer does seem unresponsive because

18 you're not asking for the results of the test.  You're saying

19 give me the test results.

20      MR. YEE:  Correct.

21      THE COURT:  Number 6, it goes back to recall products.

22 Test results on products that were recalled.  If there are no

23 recalls, then you're not getting any product; agreed?

24      MR. YEE:  Agreed.

25      THE COURT:  All right.  Let's go to number 7, all

1  tests.  This one is regardless of whether it is recalled or

2  upon return for barrels from 1/1/10 to the present.

3           Am I reading that correctly?

4           MR. YEE:  That's correct.

5           This the one that I talked about earlier where they

6  provided a spreadsheet of a bunch of numbers, but there is no

7  background information of what the barrels are.

8           And the e-mail to KKM from the Nevada Heat Treat said

9  the other documents are available upon request.  And this is

10 what we talked about earlier that Mr. Robinson indicated that

11 he would ask for, but yet we have not seen those.

12           THE COURT:  Okay.  And that's the Nevada Heat test

13 results?

14           MR. YEE:  Correct.

15           THE COURT:  Okay.

16           MR. YEE:  They produced a spreadsheet of a bunch of

17 numbers, but there is no corresponding documents to show what

18 the barrels are.  It's just a bunch of numbers.

19           THE COURT:  Based on what I read it seems to me that

20 those numbers may correlate to them testing the steel bar

21 stock; is that correct?

22           MR. YEE:  Correct.  But as I mentioned earlier, it is

23 our understanding through discovery documents that they

24 purchased different grades of bar stock from two different

25 manufacturers.

1           THE COURT:  Right.  Carpenter and the other one

2   starting with an "O."  I forget what it is called.

3           MR. YEE:  Yes.  Otocomfu (phonetic).

4           THE COURT:  Yes.  Otocomfu.  That's a hard one to

5   remember.

6           All right.  But what you are saying is they provided

7   the spreadsheet with numbers.  I'm thinking that's the bar

8   stock.  And my recollection of what they said was that they

9   tested the bar stock, but they didn't test the barrels once

10  they were manufactured from the bar stock; is that correct?

11          MR. YEE:  Correct.

12          THE COURT:  But they did submit it to Nevada Heat

13  Treatment for what, for the Rockwell hardness test, or am I

14  getting confused?

15          MR. YEE:  My understanding is that they only tested

16  the bar stock, but once the bar stock was manufactured into

17  barrels they were never tested again.

18          THE COURT:  So what did Nevada Heat Treatment do?

19          MR. YEE:  So they would heat treat the bar stock as it

20  would come in from the field manufacturers and then they would

21  heat treat it and then test it after it was heat treated and

22  tempered.

23          THE COURT:  And is that what resulted in the 42-RC

24  (phonetic)?

25          MR. YEE:  That's my understanding how they get to that

1  number.  But, again, it is my understanding based on their

2  responses throughout the case that they then take that bar

3  stock and manufacture it into barrels, but then they do not

4  test the barrels again for hardness.

5          THE COURT:  Right.  Okay.  But, in any event,

6  Plaintiffs have agreed to request documents from Nevada Heat

7  and will produce those documents.  So once we get a date at

8  least that part of it --

9  (Alarm sounded.)

10          THE COURT:  -- would be resolved, correct?

11          MR. YEE:  Correct.

12          THE COURT:  Gosh, I underestimated the time it was

13  going to take to do this.

14          Number 10, request number 10, kind of the same thing.

15  You're asking for communications with heat treating facilities.

16          MR. YEE:  Correct.

17          THE COURT:  So that's going to get taken care of.

18          MR. YEE:  Yes.  And I believe 11 is the same.

19          THE COURT:  So that will be mooted and so will 10 and

20  17.  Well, as 17 has changed substantially because initially

21  they were asserting the joint defense privilege or common

22  interest privilege, but in their response to your motion they

23  agreed to withdraw that based on a recent case *U.S v. Patel*

24  because there were no attorneys involved in the communication.

25  It was just co-conspirator to co-conspirator.

```
 1            So have they provided those documents?
 2        MR. YEE:  They provided some, Your Honor.  The
 3   documents that they originally claimed the privilege on it was
 4   Bates labeled Dame, 1 through 15, but these are comments
 5   basically isolated to July 21st to July 22nd of 2020.
 6            So this was after the lawsuit was filed and removed to
 7   federal court, but none of what they produced contain any
 8   pre-suit communications.  We have from Shooters Connection,
 9   again communications between KKM and Shooters Connection
10   regarding the barrel issue that date back to January 2020, but
11   yet KKM has not produced any of those communications.
12        THE COURT:  Okay.  Let's go to number 18,
13   communications between KKM and any nonparty regarding Akai,
14   Horowitz, or anything having to do with the steel, the type of
15   steel in the barrel or the Rockwell hardness, correct?
16        MR. YEE:  Correct.  And we touched upon this a little
17   bit earlier, Your Honor.  This is the one where again it is
18   KKM's position that Mr. McIntyre no longer has the phone, but
19   it is our position that that phone, the messages would have
20   still been pulled in or, you know, loaded into the new phone.
21            And even if that didn't happen, the text messages are
22   typically available from the cell carrier and they indicate
23   that we don't have any of the texts because of the phone issue.
24   The request itself asks for all communications and not just
25   texts.
```

1        And so as I mentioned earlier, we have documents that

2   were produced from Shooters Connection that shows that Mr.

3   McIntyre and Mr. Bradley were e-mailing each other in October

4   of 2021 regarding Mr. Nathan Carter's barrel.  And there's also

5   documents showing that Mr. Bradley and Mr. McIntyre were

6   e-mailing each other in January of 2020 regarding that barrel

7   owned by Mr. Gerry Collatione, but KKM has not produced any of

8   these e-mails or communications.

9        THE COURT:  All right.  Thanks.

10       Number 21, all documents and communications regarding

11  returned barrel 1/1/17 through the present.  That seems to me

12  to be identical to request for production number 3, no?

13       MR. YEE:  This is basically a little different.

14       We don't refer to the term recall here.  This is just

15  returned barrels.  And so based on your point earlier, you drew

16  a distinction between return barrels and recalled barrels.

17  This one just talks about barrels returned.

18       THE COURT:  Yes and number 3 only talks about return

19  barrels as well.

20       MR. YEE:  Right.

21       THE COURT:  I mean, I think it's verbatim.

22       Are you reading it or are you waiting for me to say

23  something?

24       MR. YEE:  I'm reading it, Your Honor.

25       THE COURT:  Okay.

1          MR. YEE:  Yeah, it looks like 3 and 21 are the same.

2   They just talk about return barrels.

3          THE COURT:  Right.  They're identical.  So one of

4   those is not going anywhere.

5          MR. YEE:  Right.

6          THE COURT:  Number 22 is asking for communications

7   regarding replacement barrels by KKM after return.

8          MR. YEE:  Right.  And this is what I mentioned earlier

9   that we acknowledge that barrels were returned to KKM from

10  nonparties Speed Shooters, and Venom Custom, and Keeley Custom

11  and barrels were replaced.

12         THE COURT:  Okay.  And did you get any e-mails at all

13  from the Defendant; from Defendant KKM?

14         MR. YEE:  No.  They produced an e-mail that related to

15  a gentleman named Bill Baker, who I am not sure how he fits

16  into the matter, but they have an e-mail exchange with a Bill

17  Baker who had an issue with a barrel, but that's it.  There are

18  no e-mails from KKM involving their communications with any of

19  the other parties in this case.

20         THE COURT:  Okay.  That seems to be a glaring omission

21  in this age of electronic stored information.

22         MR. YEE:  Yeah.  As I mentioned, Your Honor, they

23  produced only 167 pages and only 71 of them contain any type of

24  information that can be useful in any way.

25         THE COURT:  All right.  Number 23, produce copies of

1   communications regarding customer complaints, regarding the two

2   19/11 2011 barrels.

3           MR. YEE:  Yes and this --

4           THE COURT:  (Inaudible).

5           MR. YEE:  Right.  And this is where, again, they say

6   none.  But, yet, I mentioned that SCI Bates label 1838 and 1845

7   deal with the gentlemen named Gerry Collatione, the e-mail

8   exchanges between Mr. Bradley and Mr. McIntyre regarding his

9   complaint.  And KKM says they have nothing, but yet, I have two

10  pages here from SCI showing otherwise.

11          THE COURT:  And also just to document in mind, you're

12  talking it says any and all documents and communications.  That

13  would also potentially include oral communications, correct?

14          MR. YEE:  Correct.

15          THE COURT:  25, produce copies of correspondence,

16  communications published by KKM regarding the type of steel.

17  For those two crystal barrels (phonetic).

18          It says it will be produced and then in the second

19  amended response on Page 13 of document entry 83, Defendant

20  says that it produced KKM 18 through 29, 36 through 39, and 51

21  through 69.

22          Is that enough?  Is this now moot?  Is it resolved?

23          MR. YEE:  No, Your Honor.

24          Those documents that they are referring to are the

25  certification certificates from the steel manufacturers

1    Otucomfu and Carpenter.

2           So those are the certificate of tests from those two

3    steel manufacturers certifying that the steel that was sold to

4    the distributor Samuel Son and Company, who ultimately sold the

5    steel to KKM, those certificates show that the steels were

6    certified as grade 416 steel.

7           This is not the information showing what KKM published

8    to the public about what their steel is made from.  This is the

9    information showing what the steel manufacturers provided.

10          THE COURT:  All right.

11          MR. YEE:  So in the Joint Status Report they are

12   correct that they did provide the certification sheet, but

13   we're asking for what did you publish.

14          And as I mentioned earlier, their KKM production Bates

15   labeled 72 to 167 are fragments of the KKM website, but the

16   pages deal mostly with their frequently asked questions section

17   of the website and it has nothing to do with their advertising

18   and what they claim that the barrels are made of or what they

19   told the public, at least.

20          THE COURT:  Right.  And that seems to go to the heart

21   of your case.

22          MR. YEE:  Correct.

23          THE COURT:  All right.  On number 26 of your

24   allegations, I should say.  Number 26 website.

25          MR. YEE:  26 then specifically asks what is the

1   information on your website.  And their response is that the

2   website company that provided the information or hosted the

3   website is no longer in business and they no longer can get it.

4   But my experience with websites, Your Honor, my law firm has a

5   we can cite.  We just, in fact, retained a new company to

6   create our new website, but it is us at the law firm that

7   provides the content to the website designer.

8         And so for KKM to indicate that they don't have the

9   different versions of the content of the website, I think is a

10  little insincere in that the website designer doesn't know what

11  product they sell and what the grades of steel and how to

12  advertise them.

13        KKM would have necessarily had to provide this content

14  to the website host company.

15        THE COURT:  Okay.  Thank you.

16        And I think I (inaudible) the first motion.  Let me

17  put this back where it belongs.  I'm trying to be organized

18  here.

19        Let's turn now to -- that was an easy motion.  95-1

20  JSR and actually 95-2 and 95-3, I think, all relate to this.

21  95 -1, 95-2 and 95-3.  Okay.  So let's do ECF number 86.  It

22  took me a little bit to put these JSRs together with the

23  respective motions.  So if I've made a mistake just let me

24  know.

25        MR. YEE:  Okay.

```
 1          THE COURT:  ECF number 95-1, Pages 1 through 12, it's
 2   a joint status regarding Plaintiffs' second request for
 3   production to KKM and that one in particular is pretty simple.
 4   It's looking for purchase and sale records of BQ-5 steel and
 5   416-R steel.  And then, sales of barrels of KKM of the same
 6   BQ-5 steel and 416-R sale, correct?
 7          MR. YEE:  Correct.
 8          THE COURT:  Okay.  Now here, I noticed that you start
 9   with January 16th as opposed to your typical January 17th.  Is
10   there any reason for that?
11          MR. YEE:  I'm sorry.  Where are you referring to, Your
12   Honor?
13          THE COURT:  In the request for production number 1.
14   I'm sorry.  I should have been more specific.  Your timeframe
15   is January 2016 to the present.  Everywhere else I've seen
16   January '17 to the present.
17          MR. YEE:  I don't recall if that was specific or if
18   that was a just a typo, Your Honor.
19          THE COURT:  Okay.
20          MR. YEE:  At the present that '16 date kind of escapes
21   me.
22          MR. FIATO:  Your Honor, this is Attorney Richard
23   Fiato.
24          That date was specifically used because of the data
25   sheets that KKM provided, they showed the use of different
```

1   steels starting around that time.

2          THE COURT:  Okay.  And how is that material?

3          MR. FIATO:  We were looking for the sales information

4   on the different types of barrels that they were selling from

5   different steel from that time to show that they were using two

6   different types of steel.

7          THE COURT:  Okay.

8          MR. FIATO:  And to whom they were selling it to.

9          THE COURT:  All right.  Let me ask you a question.

10          In 86, this is a general question, a macro question

11   because I was confused on these JSRs and how they applied to

12   the motion.  The motion at ECF number 96 alleges as well that

13   the Defendant KKM failed to respond to the first request for

14   admissions, but this particular JSR only deals with the second

15   request.

16          MR. YEE:  This is Attorney Yee, Your Honor.  That is

17   correct.  Defendant KKM, they failed wholeheartedly to respond

18   even to the first set which conclusively, I guess, established

19   certain --

20          THE COURT:  I'm sorry.  I misspoke.  I think 86 says

21   that the Defendant failed to respond to the first request for

22   production.  I'm talking about the request for production.

23          I missed my request for production, but the JSR only

24   deals with the second request for production.  Does this mean

25   that they have now complied or responded to the first request

1   for production?

2          MR. YEE:  No, Your Honor.

3          In ECF 86 we do assert that KKM failed to respond to

4   Plaintiffs' first request for admissions and interrogatories

5   and that's on Page 3 at ECF.

6          THE COURT:  They respond and not to you, correct?

7          MR. YEE:  Correct.  To our knowledge KKM is not even

8   asserting.  They never addressed it.  They never said we put

9   the answers together and we have just never served it.  I don't

10  know, Your Honor.

11         THE COURT:  And that was on the request for

12  admissions?

13         MR. YEE:  Correct.

14         THE COURT:  Okay.  I missed that.  All right.

15         MR. YEE:  And that's part of what we point out in ECF

16  86, Your Honor.  So I think they knew that they failed to

17  respond to the first set.  So when they responded to our second

18  request for admissions, they entitled their responses

19  Defendants' response to Plaintiffs' dated April 12, 2022

20  instead of the proper title of Plaintiffs' Request For

21  Admissions dated April 12 of 2022 instead of the proper title

22  of Plaintiffs' second Request For Admissions.

23         THE COURT:  I read that, but I didn't see the import

24  of the misnomer.

25         Okay.  Oh, my goodness there is a lot going on here.

1      MR. YEE:  Yes, there is, Your Honor.

2      THE COURT:  And first request for admission and we've

3  got SCI and that was 2/7/22 getting served that provided

4  unverified and then we'll get to that.

5      Okay.  And what about I think you also say in 86 that

6  KKM failed to respond to the interrogatories.  Is that still at

7  issue also?

8      MR. YEE:  Yes, that would be the first set of request

9  for admission and interrogatories.  So our first set of

10 admissions also has some interrogatories to some of the

11 requests for admissions.  Not all of them and some of them they

12 didn't answer either the request for admissions or the related

13 interrogatories.

14     THE COURT:  Okay.  Number 2, sales -- okay.

15 Fortunately I don't have any questions on that.

16     Purchase of the BQ-5 steel.  Now here you go back to

17 2010.  Why in request 23?

18     MR. YEE:  I believe based again as Attorney Fiato

19 mentioned, Your Honor, through some of the documents that we

20 did receive from KKM's production, they indicated some of the

21 certifications of the tests showing barrels purchased as far

22 back as 2010.

23     THE COURT:  Okay.

24     MR. FIATO:  And Your Honor this is Attorney Richard

25 Fiato again.  And the other thing is what they did produce,

1  they didn't produce anything from 2010 until 2014.  They

2  produced one cert or one data sheet of testing.  And then, they

3  produced from 15 on after that and there were two different

4  types of steel.

5          THE COURT:  Right.  So you want stuff from 2014?

6          MR. YEE:  2010.

7          THE COURT:  2010 to 2014.

8          MR. YEE:  2010 to present, Your Honor.  This is

9  Attorney Yee.

10         THE COURT:  Right.  I'm a little confused because

11 what's the difference whether they bought other kinds of steel?

12 I'm sure they are entitled to buy whatever steel they want.

13 Isn't the issue in this case whether or not they used the steel

14 that you expected that they use in your pistol barrels?

15         MR. YEE:  The relevance, Your Honor, is we believe

16 that they have changed the different types of steel over the

17 years, but they have always maintained that it was the same.

18 But the records will show that they have changed different

19 types.

20         THE COURT:  All right.  Let's go on to the next sub

21 part of 95-2 the request for production.  Let's go to 95-2 and

22 that is Plaintiffs' motion to compel third request for

23 production of KKM.

24         Okay.  And again, this deals with the steel.  For

25 request number 2 you want sales records of barrels that were

1  not made from 416-R.  So you want a negative.

2      MR. YEE:  Correct.  And the issue here, Your Honor, is

3  they have now changed the narrative.  The issue in this case

4  is, as you pointed out early on, is that Defendant KKM have

5  asserted from the very beginning pre-litigation.  And early on

6  part of the litigation that all of the barrels are made from a

7  416-R gun barrel quality steel.

8      And through discovery they produced the testing

9  protocol document that for the first time it was never

10  mentioned in their answer for affirmative defenses.  It was

11  never answered mentioned public letter that they published back

12  in January of 2020.

13      But in discovery they produced a document showing a

14  testing procedure for what is considered a 416 restricted steel

15  which no one has ever heard of.  As you can see in the Joint

16  Status Report, they are indicating that the R that they are

17  referring to stands for restricted which is the first time

18  we've heard of it.

19      But as you can see, Your Honor, we attached as part of

20  the Joint Status Report, a declaration from one of the steel

21  manufacturers, the Otucomfu specifically that indicate in that

22  declaration that they sold 416 steel.  Not 416-R and not 416

23  restricted.

24      And anything to the contrary would be false or

25  misleading and absolutely untrue and that's why we're asking

1  for accurate answers here.  You know, Defendants might not like

2  it, but the steel manufacturer says that the steel is 416 and

3  not 416-R or 416 restricted.

4         THE COURT:  Right.  Except these are not

5  interrogatories.  So they either have the documents that you

6  want or they don't.

7         MR. YEE:  Right.  But their answer is that all of our

8  steel is 416-R, which we know from the declaration and the

9  document they produced that it was not.

10        THE COURT:  You know it is funny that you mentioned

11 that.  I was going to save this for last because I think this

12 is the overarching issue and these requests when we get down to

13 the nitty-gritty, your position is exactly that.  That 416-R is

14 a specific type of steel, I take it, and different from 416; is

15 that correct?

16        MR. YEE:  Correct.

17        THE COURT:  Defendant is saying it's not.

18        You know, they have specifications which makes the 416

19 that they bought restricted and you may disagree with their

20 nomenclature, but that's your problem.  That's what they are

21 saying, right?

22        MR. YEE:  That's what they are saying, but in light of

23 the declaration from the steel manufacturer, itself, that said

24 that it is 416, I don't know how you --

25        THE COURT:  Isn't this, at the end of the day, truly

1  an issue that is going to go to the trier of fact to determine?

2        MR. YEE:  Ultimately, yes, Your Honor.

3        THE COURT:  As opposed to trying to prove your case

4  through a request for production or an interrogatory, they're

5  going to live or die by their answers.  I can't make them say

6  what you want them to say, but they are going to live with

7  their answers.

8            Isn't that correct?

9        MR. YEE:  That's correct.

10           We're just looking for obviously discovery is to

11  ensure that the parties are not taken by surprise in the

12  documents they produce.

13           It is just our position, as you can see in the motion,

14  the overall theme is that there are many inconsistencies from

15  the answers to the complaint, from discovery answer to

16  discovery answer and it is just a moving target.  And that's

17  why we felt it necessary to bring it to the Court's attention.

18           I agree with you that the ultimate issue is probably

19  for the trier of fact, but when you are dealing with this

20  through discovery and trying to narrow the issues it makes it

21  difficult when the target is always moving.

22        THE COURT:  I understand that.

23           All right.  It doesn't make it easier to rule on

24  these, but I understand the issues.

25           Next request for number 7, you are looking for studies

1  that the Defendant may have seen or relied on regarding BQ-5

2  steel as being appropriate for the 1911 barrel.

3        Plaintiffs say it didn't use any.  What more do you

4  want?  It said that it did not obtain or create any studies.

5        MR. YEE:  Right.  And they also respond in their

6  motion saying -- and this is where we took issue with it and

7  why we needed to bring it to the Court's attention is that they

8  now assert that they didn't start first using BQ-5 until 2020.

9        Specifically, I think they're claiming that they

10  didn't start using BQ-5 steel until August of 2020.  But, yet,

11  in their answer to Plaintiffs' first amended complaint,

12  Paragraph 65, that's that text discussion between Mr. McIntyre

13  and Mr. Carter.

14        Mr. McIntyre indicates that one of the barrels that we

15  sell as a BQ-5 barrel, but because you didn't buy directly from

16  us we don't know which one you got.  So this is a conversation

17  that happened in 2019, which confirms that they were using BQ-5

18  prior to 2020.  And then, we also have in their open letter

19  that they published to the public in a January 9, 2020, letter

20  that references a BQ-5 steel.

21        So in January 2020 they're saying that they have a

22  BQ-5 steel.  But, yet, in their response to the motion and

23  response to discovery they are saying we didn't start using

24  BQ-5 until midway through 2020.  That's an inconsistency.

25  Again, it is a lot like the 416-R issue, but yet again it is

1  another moving target.

2       MR. FIATO:  Your Honor, this is Attorney Richard

3  Fiato.

4       The last piece of that there is also SCI manager was

5  communicating with a Michael Dame and we have those text

6  messages by way of discovery through Mr. Dame, in which he says

7  that if you are purchasing barrels directly from KKM they are,

8  what he calls, 416-R.  But if you are buying them through

9  vendors or KKM's dealers, it's 99 percent chance you are

10 getting BQ products.

11      MR. YEE:  And this is Attorney Yee, Your Honor.  That

12 communication was Exhibit 5 to -- I forget exact which one --

13      THE COURT:  I've read all of those and I am glad that

14 you referenced those e-mails a couple of times in different

15 motions and I read them.

16      But, quite frankly, well -- I don't want to argue the

17 Defense side, but I see other interpretations to those that if

18 you are getting it from me I know I'm giving you 416, but if

19 you are getting it from somewhere else who buys other vendor's

20 products, you may be getting BQ-5.

21      I mean, that's one interpretation and the same thing

22 goes for the e-mail.  I don't know what, you know, I don't know

23 what you have .  It could be one or it could be the other.  It

24 doesn't necessarily mean I saw both.  It means I don't know,

25 but again I --

1           MR. YEE:  The point is, Your Honor -- this is Attorney

2    Yee -- the point is that the communication was from

3    December 19th between Mr. Bliger (phonetic) and Mr. Dame.

4    Again, this is 2019.

5           KKM's answer to discovery is saying that they didn't

6    start using BQ-5 until midway through 2020.  But, yet, Mr.

7    Bliger was of the knowledge that they were getting BQ-5 barrels

8    from KKM in 2019.

9           THE COURT:  Okay.

10          MR. YEE:  That's the relevance of it.

11          THE COURT:  Right.  I mean, I understand the issue.  I

12   just don't see how you are going to get to nail them down on

13   any of that stuff through this discovery, to be honest with

14   you.  Their answers, I keep saying this because they're going

15   to live or die with their answers.  I can't make them say what

16   you want them to say.

17          All right.  Let's go to -- I think that's it for that

18   one.  Let's go to the next which is 95-3, Joint Status Report

19   on Plaintiffs' motion to compel accurate answers to Plaintiffs'

20   second request for admissions.

21          MR. YEE:  Right.  And this is what we have already

22   talked about, Your Honor.  This is Attorney Yee.

23          This is the whole issue with the declaration from

24   Otucomfu.  You've already indicated that obviously you can't

25   make them say what we want them to say, but the primary dispute

1  with the second set of requests for admissions to KKM in that

2  is that they are changing the narrative to say that the R

3  stands for restricted.  But, yet, the manufacturer of steel,

4  itself, says it is just 416.

5          I think you have already addressed that indicating

6  that, you know, they live and die by their answers.

7          THE COURT:  All right.  And here they've denied.  It

8  is not like they equivocated.  They've denied.  So you're going

9  to do with that at trial what you're going to do with that at

10 trial.

11         MR. YEE:  Right.

12         THE COURT:  And then request number 10 is the same

13 pretty much, denied.

14         Okay.  Give me one second.

15         MR. YEE:  And I don't know if you want me to make a --

16 this is attorney Yee.  I don't know if you want me to make a

17 statement now, or we could save it for rebuttal.

18         But, again, if you take a step back and realize that

19 part of our argument in ECF 86 is that because KKM failed to

20 respond to Plaintiffs' first request for admissions, which

21 asked them to admit that BQ-5 steel is not 416-R that the steel

22 is not -- that if that's the case, then that they sold BQ-5

23 prior, you know, to 2020 because they failed to answer those, a

24 lot of the followup questions in the second request for

25 admissions kind of built on those.

1          So because they failed to answer the first set that's

2    why we felt strongly that a lot of it was really conclusively

3    established.  So when they answer a second set, for them to

4    deny and come up with this 416 restricted narrative, it kind of

5    is counterintuitive or a moving target on the first set that

6    should already be deemed admitted because they failed to

7    respond to those altogether.

8          THE COURT:  Right.  I'm glad you brought it up.  Hold

9    that thought.  We'll talk some more about it in rebuttal after

10   I have a chance to speak to KKM.

11         MR. YEE:  Okay.

12         THE COURT:  All right.  Let's turn to the last of

13   Plaintiffs' motion, which is reflected in the Joint Status

14   Report at 95-4.  And this one is Plaintiffs' motion to deem

15   matters admitted or -- and this is in reference to the second

16   request for admissions as to SCI, correct?

17         MR. YEE:  Correct.

18         THE COURT:  The first request of what I have is at 88,

19   you said number 8.  I've got Defendant SCI's motion for relief

20   from your claim, which I guess is brought up in your ECF number

21   86.

22          In passing, quite frankly, it's a little line on Page

23   13 that says: KKM dealers were made using, blah, blah, blah,

24   Defendant SCI has similarly failed to respond to the

25   Plaintiffs' first request for admissions and interrogatories

 1   and these things are admitted.  That's the extent of your

 2   argument, correct?

 3          MR. YEE:  We make reference to that in a motion, but

 4   that's the subject of SCI's motion for relief from the

 5   technical admissions, which is ECF 88.

 6          THE COURT:  But you don't have a separate motion in

 7   that.  It is included on ECF 86 and it's on Page 3, that line

 8   that I just read.

 9          MR. YEE:  Correct.  ECF 90, which is our last motion

10   deals with SCI's answer to our second set of request for

11   admissions.

12          THE COURT:  Correct.  Which is where we are going now.

13          MR. YEE:  Correct.

14          THE COURT:  The firs is that.  And then, in response

15   SCI to that line, I think ECF 86, SCI filed I think ECF 88,

16   which is a request for relief from Plaintiffs' claim of

17   technical admission.

18          MR. YEE:  Correct.

19          THE COURT:  Okeydokey.  I'm going to put together a

20   jigsaw puzzle of these motions.

21          All right.  Now let's turn to the Plaintiffs' last

22   motion 95-4, motion to deem matters admitted.  Second request

23   for admission to Defendant Shooters.  Now, again, we've got

24   amended to those requests in which they deny.

25          MR. YEE:  Right.  And this is the same argument -- I'm

1  sorry, Your Honor.

2       THE COURT:  I'm sorry.  So they deny those.  I didn't

3  count them, but there must be a good dozen or so.  All the even

4  numbers all the way up to 50.

5       MR. YEE:  Right.

6       THE COURT:  They deny those.

7       And then for 52, 55, and 56 they said they've a made a

8  reasonable inquiry and I will certainly talk to them about the

9  reasonableness and what inquiries.

10       But, in fact, if they have made a reasonable inquiry

11  and can't find anything that would be an appropriate answer.

12  And as to number 53 for the boilerplate objection that I will

13  probably strike they admitted.  So in terms of the first even

14  number than 53, they've pretty much responded with an admission

15  and a denial.  So as to those you know what my answer is going.

16       MR. YEE:  Right.

17       THE COURT:  Now, let's talk about -- give me one

18  moment.

19       As to 52, 55, and 56, let's talk about those because

20  that's where there may be some wiggle room.

21       MR. YEE:  Here, Your Honor, we're looking for the

22  website information from Shooters Connection, SCI, because we

23  saw at one point in time they advertised on their website their

24  advertising related to KKM barrels.

25       At one time it advertised the greatest steel that was

1   used and the Rockwell hardness and then there is another

2   version of the same website that did not show any reference to

3   the greatest steel and/or the Rockwell hardness.

4           THE COURT:  Right.

5           MR. YEE:  All SCI indicates is that they made a

6   reasonable inquiry.  They don't indicate what inquiry they made

7   and they said they simply don't have previous copies and I

8   addressed this earlier even with KKM.

9           SCI president Charles Bradley testified at deposition

10  last week that they hired a gentlemen out of Florida to create

11  the website and that he and his sister, Mr. Bradley's sister,

12  are the ones that typically put information up there on the

13  website.

14          So again, they control the content and they claim that

15  they don't have that information that they've claimed they get

16  it directly from KKM.  But one important thing to note is Mr.

17  Bradley admitted during deposition that he never contacted the

18  gentlemen from Florida who created the website to see from a

19  technical standpoint if there is a way to go back and get prior

20  versions.

21          I mean, he never even made that phone call.  He just

22  indicated that between he and his sister, he just assumed that

23  they couldn't retrieve it, but never even contacted the

24  website.

25          THE COURT:  Funny you should say that because one of

1  the questions that I have for Defendant, which I wrote down in

2  my notes, is has SCI contacted third party web administrator

3  designer to determine if previous versions of the SCI web page

4  can be retrieved.

5       MR. YEE:  Right.  And Mr. Bradley indicated at

6  deposition last week that he had not.

7       THE COURT:  Okay.  All right.  So we'll talk some more

8  about that and then 53 we talked about.

9       Okay.  So I think that's it for your motions.  Why

10  don't I hear you briefly.  I think I will be more efficient a

11  little bit out of turn, but just respond to 80 to 88, which is

12  SCI's motion for relief from admission as to their request for

13  admission number 1.

14       Who is this?

15       MR. YEE:  So brief response, Your Honor, is that you

16  can see in SCI's motion they admit that they did not properly

17  serve the responses to Plaintiffs' first request for admissions

18  to SCI and indicate that it is just an administrative clerical

19  error that they were not served.

20       But it is our, position, Your Honor, if you look

21  closely at the e-mail that was sent by the assistant at, I

22  believe it is Mr. Chiocca's office.  There's another attorney

23  in the case that is no longer with the firm.

24       But you can see in the e-mail they reference please

25  see attached responses to Plaintiffs' first request for

1  admissions and unverified interrogatories, which indicates or
2  implies that the responses were not even complete.

3         THE COURT:  And I don't actually have that e-mail.
4  Hold on.  Let me see if I have that.  I'm going to see if you
5  attached it.  Did you attach it?  I'm looking at Plaintiffs' --
6  I'm sorry.  Defendants motion 88.  They attached the affidavit
7  of Melissa Benson in an e-mail.  Let's see what it says.

8         And she finds the service of documents on Defendants'
9  Shooters Connection as to (inaudible)'s request unverified
10 interrogatories.  I see it.  I do have it.

11        MR. YEE:  So, it is our position that it appears to be
12 an internal e-mail amongst Defense counsel to finalize the
13 responses and then obviously properly serve them, but that was
14 never done.

15        And so, they are standing behind that e-mail as proof
16 that they completed the answers and served them on Plaintiffs'
17 counsel.  But, yet, they admitted when I pointed out to them if
18 you look at the e-mail chain, neither Mr. Fiato or I were
19 included in that e-mail and, therefore, they were not served.

20        And so, they were deemed admitted.  And if you look
21 closely at the e-mail, that e-mail was sent by Miss Benson to
22 no less than five attorneys; four of which represent Shooters
23 Connection.

24        So there are different firms here, Your Honor, that
25 are currently representing SCI and no one diligently or

1  promptly directed that the responses be finalized and be served

2  on either myself or a Mr. Fiato and so --

3          THE COURT:  I get that and I see, you know, based on

4  what I've read in your response it sounds like the responses in

5  the first request for admission are different than the

6  responses -- if I were to deem them --

7          MR. YEE:  Right.

8          THE COURT:  Verifiable.

9          They are different from, again, the request for the

10  admissions and second request for admissions.  I get it.

11  Doesn't that ultimately inure to your benefit in terms of a

12  trial tactic?

13          MR. YEE:  Yeah, ultimately I think it would, Your

14  Honor.

15          THE COURT:  So, like, in terms of the prejudice, if I

16  were to deem that these admissions, that the first request for

17  admission will be deemed served because there is no real

18  prejudice to you.  I think the prejudice is to them because

19  they have two very different responses.

20          Would you agree with that statement?

21          MR. YEE:  I would agree.

22          THE COURT:  Okay.  I don't think they get a do-over.

23  That's not going to happen.  So the best they could hope for

24  today is that they would be deemed served.

25          All right.  Thanks.  Let me talk to them.  Obviously

1  this went way longer than 20 minutes.  Did we really go on for

2  an hour and 25 minutes?

3          MR. YEE:  It appears so, Your Honor.

4          THE COURT:  Holy-moly.  Okay.

5          MR. FIATO:  We did, Your Honor.  We did.

6          THE COURT:  That's a lot.

7          Okay.  So let me turn now to the Defense and I'll set

8  the timer for 20 minutes.  I'm just kidding.  I'm just kidding,

9  fellows.

10          And who is going to be responding, Mr. Mari or Mr.

11  Benford?

12          MR. MARI:  This is Nicolas Mari.

13          I will be responding on behalf of KKM.  I don't know

14  what order that the Court would like to hear from us.

15          THE COURT:  We're going to do it exactly the same as

16  we did with Mr. Yee.  And I have lots of questions for you as

17  well.  So I totally underestimated my verbosity.

18          MR. MARI:  No problem.  I'm happy to answer them.

19          THE COURT:  Let's start with ECF number 95, Pages 1

20  through 18.  That's the Joint Status Report for the parties

21  regarding Plaintiffs' personal (inaudible) and Plaintiffs'

22  first request for production for KKM.

23          And you know, why don't we kind of go through the way

24  we did, the way I did with Mr. Yee.  I think it is best for me

25  to discuss these substantive (inaudible).

1          Starting with request number 1, this deals with the

2   (inaudible) barrels that were returned.

3          Let me get my highlighter?

4          Now, I think we may have a resolution on this one,

5   correct me if I'm wrong, but according to my conversation with

6   Mr. Yee, this could be resolved by the actual implementation of

7   the joint testing protocol and your production if you still

8   have it of the Akai Thompson Sleeved failed barrel.

9          MR. MARI:  So that is correct, Your Honor.

10          With the only thing that I believe Mr. Yee agrees as

11  well, we would want a mutual exchange, which has been what the

12  parties discussed.

13          The Plaintiffs are still in possession of some KKM

14  barrels.  And back and forth we've talked about a joint testing

15  protocol to exchange the barrels that are in the respective

16  parties' possessions.  So we're not opposed to that.  We, in

17  fact, been in agreement --

18          THE COURT:  What gets me about this motion and about

19  you guys is that you sound perfectly reasonable and you agree

20  to these things, but then you don't execute them.

21          What's the point of that?

22          MR. MARI:  Well, all I can say, Your Honor, is that we

23  have never received any draft from the Plaintiffs.  I can't

24  speculate to what the reason why this hasn't been completed,

25  but we are in agreement with the joint testing protocol.  We

1  would like to test the barrels that they have and they say they

2  would like to test the barrels that we have.

3        So it's not even really a matter of disputed language

4  at this point.  There just hasn't been execution on either side

5  to get that protocol finalized.

6        THE COURT:  Okay.  Well, we'll work on that because I

7  think if we do that and you turn over the Akai Thompson Sleeved

8  failed barrel, this is resolved.

9        MR. MARI:  KKM agrees, Your Honor.

10        THE COURT:  Okay.  Let's go to request number 3,

11  communications regarding barrel returns.

12        MR. MARI:  Yes, Your Honor.

13        A couple of points and this is going to apply to the

14  multiple requests here, but there were -- and we've put this in

15  our response to the motion to compel.  There were some barrels

16  that were returned.  Not recalled, as Your Honor correctly

17  pointed out, because our position is there has never been a

18  recall.

19        So for those answers we simply responded none, but for

20  these that are asking for barrels that were returned, we

21  explained that barrels were tested and there was no print, or

22  pictures, or otherwise preservation of the results of those

23  barrels and then once they were tested they were returned to

24  the customers.

25        So, ultimately, the answer there is at the end that we

1    searched and we have nothing responsive other than what has

2    been produced indicated with the Bates stamps in our response.

3    So we take aim that we don't have it.  And Your Honor correctly

4    pointed out we can't be compelled to produce something that we

5    don't have.  If they don't like that answer, that's their

6    prerogative but --

7              THE COURT:  Well, right now let me back you up, Mr.

8    Mari.

9              MR. MARI:  Sure.

10             THE COURT:  The question is produce documents and

11   communications in any way related to KKM barrels returned to

12   KKM.  Your answer is totally unresponsive.  It says all KKM

13   manufacturers of barrels have been tested and are within

14   specification blah, blah, blah.

15             Isn't the answer we don't have any or we do?

16             MR. MARI:  And that was clarified in our response to

17   the motion to compel and also in the joint statement is that

18   there are no physical results.

19             Plaintiffs have said it is their opinion that they may

20   be saved on a computer, but that is unverified and that's

21   Plaintiffs' speculation.  There is no evidence before the Court

22   that there is data saved on a computer that KKM is withholding.

23             THE COURT:  I'm sorry.  Hold on, Mr. Mari, but this

24   particular request does not ask you for test results.  It asks

25   you for any communications related to barrels that were

1    returned to KKM between January 2017 and the present.

2         MR. MARI:  And I think that bleeds into some of the

3    later requests asking for text messages and the like.  What KKM

4    has responded is that we don't have those in our possession

5    anymore and, ultimately, that is the response.  And I think one

6    of the main issues in this situation is that no one from KKM

7    has been deposed yet.

8         So to the extent that there is a question about the

9    sufficiency about the searches or how certain things were

10   available at some point, but no longer are, there may be very

11   reasonable explanations to that that haven't been explored

12   through discovery.

13        And frankly, KKM's representative and owner I think

14   would be able to answer those questions at a deposition.  But

15   the answer to this response -- and I will be happy to amend it

16   formally if we need to, but what we have said here and is our

17   position is that there is nothing responsive to this.

18        And one comment that the Court made earlier during the

19   Plaintiffs' presentation about the digital age.  Just for some

20   context from what I understand this industry, which is a

21   specialized industry and particular KKM operates largely over

22   the telephone.

23        It is not like, you know, what we're used to in the

24   legal industry where everything is documented by e-mail.  My

25   understanding in that the folks at KKM, they pick up the phone,

1   they relay the test results, and they take orders by phone.

2          So this is not a document extensive industry.  Whether

3   that is good or bad, that is not for me to opine on, but for

4   purposes of discovery and document production, this isn't a

5   situation where everything is exchanged by e-mail and by formal

6   letters, et cetera.  A lot of it is done orally over the phone.

7          THE COURT:  But has anyone at KKM done any kind of

8   search on its computers to see what's in there?

9          MR. MARI:  Yes, Your Honor.

10          And I spoke to my client yesterday and they did key

11   word searches for the various parties and nonparties' names

12   that appear throughout these request in the pleadings and

13   anything that has come up has been produced.  They have done

14   searches for specific e-mail addresses associated again with

15   the parties and nonparties.

16          So other than that that's KKM's response and to the

17   extent that, again, Plaintiffs don't like it, we don't have

18   anything more than that.

19          THE COURT:  All right.  Let's go to the Plaintiffs

20   says that it's got documents from SCI showing that KKM provided

21   test reports on barrels returned to KKM by Venom through SCI.

22   Where are these documents and what have you done to find these

23   documents, if anything?

24          MR. MARI:  Your Honor, we have had the owner search

25   for key word search for Venom Custom and Nevada Heat Treating

1 and there is nothing responsive within their possession or

2 control.  And that is one of the things that came up a couple

3 of times is Nevada Heat Treating and that is not a company that

4 is affiliated, or a sister company, or a parent company, or

5 anything like that with respect to KKM.

6         So I'm getting a little bit ahead of myself here, but

7 for these nonparties, I don't see how KKM can be compelled to

8 produce things that are in the possession of a nonparty.

9         As a professional courtesy, they have reached out to

10 Nevada Heat and I can represent to the Court that that has

11 already happened.  They previously asked for these documents

12 that Nevada Heat may have in its possession.  And as of a

13 yesterday, Nevada Heat had not produced anything.

14         Another thing I will point out is that the Plaintiffs

15 subpoenaed these nonparties, Nevada Heat, Venom Custom back in

16 February of this year.  So to the extent that they are seeking

17 to compel documents for these nonparties, it seems that their

18 efforts should be directed at Nevada Heat and Venom Custom as

19 opposed to KKM.

20         THE COURT:  But it sounds like they're already doing

21 that based on what we just said.

22         MR. MARI:  Well, they subpoenaed them back in

23 February, but it has been five months.  And they are saying

24 they haven't gotten any documents from Nevada Heat or Venom

25 Custom.  The proper mechanism would be to move to compel them

```
 1    and not moving to compel KKM.

 2           THE COURT:  All right.  Let's go to request number 4.

 3    These are communications or documents regarding any recall.

 4           MR. MARI:  And it is KKM's position that it has never

 5    had a recall.  So there is nothing responsive.

 6           THE COURT:  And I think in your second amended

 7    response you said none, correct?

 8           MR. MARI:  Correct.  And throughout all of our

 9    position statements.

10           THE COURT:  Okay.  Next we've got number 5, test

11    results of barrels unreturned.

12           MR. MARI:  And that goes to my previous point that

13    we've responded there are none.  Any barrels that we had that

14    were sent back were tested and returned to the customers.

15           We don't even have the ability to test them today.

16    Other than the ones with the caveat of the ones for the Akai,

17    the ones that we do still have in our possession.  But,

18    otherwise, there is no documentation of test results for the

19    barrels that were returned to -- or were sent to KKM and then

20    returned to the customers.

21           THE COURT:  What about this innovating test machine

22    and its capacity to be connected with a computer so that the

23    results would be saved?

24           MR. MARI:  So, again, I think that's something that

25    should be bore out more through discovery, but my understanding
```

1  -- or I should say I don't have any information to say

2  otherwise.  But I have to assume that was explored upon these

3  requests because if there is a computer storing that that would

4  be responsive.  But, ultimately, we've said that we do not have

5  them.

6          So, again, I think this is something -- this is why I

7  think some of these requests and these issues before the Court

8  are a little premature because KKM's representative or owner

9  could answer these questions during a deposition, but as of

10  now --

11          THE COURT:  That may well be true, Mr. Mari, but

12  certainly I'm not in a position to direct.  Just like I can't

13  make you deny or admit your answers.  I am not in a position to

14  direct the Plaintiffs to use the discovery tools in any

15  particular order.

16          And these requests for production, just like a

17  deposition, you know, are a discovery device and it puts the

18  burden on your client to search their computers and their

19  records for the documents that they are requesting.

20          So if, in fact, the innovating testing machine has the

21  capacity to be connected to a computer and these documents

22  exist, it inclines the possibility to produce them.

23          MR. MARI:  And I don't disagree with that, Your Honor.

24  But ultimately, though, our answer is none.  And like the Court

25  pointed out, KKM lives and dies by its answers.  So we have

1  responded in the affirmative that there are not.  To the extent

2  that there is anything that we need to supplement our answer

3  with, we will do that accordingly, but as of now we have

4  responded none.

5          THE COURT:  Okay.  Next test results on any barrel

6  that you have recalled.

7          MR. MARI:  And again, this is the recall issue that

8  KKM's position is that there was no recall.  So we responded

9  none.

10          THE COURT:  Okay.  Number 7, all tests regardless of

11  whether it is done, recall, or return product from 1/10 to the

12  present.

13          MR. MARI:  Correct.  And a lot of KKM's position is

14  similar that there are no test results and this is the answer

15  that gets into Nevada Heat.

16          And as I mentioned, KKM has requested that Nevada Heat

17  provide that information, but KKM cannot compel Nevada Heat

18  itself.  It has no control or authority over Nevada Heat to

19  provide these documents.

20          So I think this is, frankly, an issue between the

21  Plaintiffs and Nevada Heat to the extent they feel Nevada Heat

22  has failed to respond to their subpoena from February.

23          That said, if we do receive anything from Nevada Heat,

24  we have agreed to produce it and we will, but as of -- I will

25  represent to the Court that as of yesterday, KKM had not

1 received anything.

2 THE COURT: Next is number 10 communications with heat

3 treating facility. I think we will both agree that will be

4 mooted with Nevada Heat.

5 MR. MARI: Well, to the extent Nevada Heat responds to

6 KKM, yes, Your Honor, I would agree that is a mooted issue, but

7 to the extent that the Court is inclined to compel KKM, I'm not

8 sure what KKM has within its power or authority to force Nevada

9 Heat, itself, to respond. So it was the same issue that we

10 were talking about before.

11 THE COURT: Right. I think we're going to assume good

12 faith here on the part of everybody including Nevada Heat. And

13 your request from one end, coupled with Plaintiffs' subpoena on

14 the other hand. So hopefully we will get some resolution on

15 that.

16 MR. MARI: Like I said, Your Honor, if we receive

17 anything from Nevada Heat we will produce it.

18 THE COURT: Communication with heat treating processes

19 and procedures.

20 MR. MARI: And this is the Nevada Heat issue again as

21 well.

22 THE COURT: Okay. Number 17, you are going to provide

23 those records, 1 through 15, if you haven't already.

24 MR. MARI: I'm sorry, Your Honor . 1 through 15?

25 THE COURT: Those are the items on the privilege log

1  that you had previously withheld based on the joint defense or

2  common interest doctrine.

3         MR. MARI:  Those have been produced.

4         THE COURT:  All right.  My next question on that is

5  what about pre-suit communication between the parties?

6         MR. MARI:  I would agree that is encompassed in there

7  in this request and KKM's responses that it is not in

8  possession of anything that has not been produced.

9         I know Plaintiffs' counsel has said that it has

10  received internal communication from parties of other sources.

11  That doesn't necessarily mean that KKM has it in its

12  possession.  So I'm not saying that it doesn't exist that there

13  was no communication.

14         I'm saying that KKM is representing that it does not

15  have anything in its possession or control at this time.  The

16  only other thing on this request, Your Honor, and I wasn't sure

17  based on the Plaintiffs' presentation, to the extent they are

18  seeking any communication amongst the parties where the

19  attorneys were present, we would maintain our objections

20  obviously to that.

21         THE COURT:  And if there are any such communications

22  with attorneys and it is attorney/client privilege, then the

23  right thing to do is to produce a privilege log that would

24  identify those documents so that the other side at least knows

25  that those documents exist.

1      MR. MARI:  Correct, Your Honor.

2      THE COURT:  And challenge the designation if they feel

3  that it is inappropriately classified as privileged, but they

4  can't do that unless they know they exist.

5      MR. MARI:  Understood, Your Honor, and I agree with

6  that.

7      THE COURT:  All right.  Request number 18,

8  communications between KKM and any nonparty.

9      MR. MARI:  Yes, Your Honor.

10      And this is getting into the cell phone issue.  We've

11  advised Plaintiffs' counsel and it is within our position and

12  statement that any texts on his old phone, Mr. McIntyre's old

13  phone, are no longer in his possession.

14      I know that they have speculated that it would be

15  transferred over to the Cloud.  I specifically requested if

16  there was anything on the Cloud and I was told that there is

17  not.  So our response is that anything that was produced with

18  those Bates stamps is everything that is in our possession and

19  control.

20      THE COURT:  All right.  So that just takes care of the

21  text messages.  But Mr. Yee pointed out that in addition to

22  that this is a broader request.

23      It is not just asking for these text messages.  You

24  are expected to look for ESI.  You are expected to look for

25  paper copies.  You know, phone logs.  Communications is a broad

1  concept.  Has that been done?

2       MR. MARI:  That would have been included within some

3  of these other requests and, yes, it has.  And there was also a

4  comment by Mr. Yee that the cell carrier may still have text

5  messages.  And that is something that they are welcome to

6  subpoena, but that's not something that a cell carrier is not

7  within our possession or control.

8       So I agree that this is just broader than just text

9  messages.  And the response that we have asserted that other

10 than documents produced, there is nothing responsive.  And

11 again, I think supplement it to the extent anything exists, but

12 we have searched -- KKM has searched various ways and various

13 times.

14      THE COURT:  Number 21, any documents, communications

15 regarding returned barrels, testing or this is duplicate of

16 number 3.  Forget that one.

17      MR. MARI:  Correct, Your Honor.

18      THE COURT:  Number 22, any communications, replacement

19 barrels after return.

20      MR. MARI:  And our response was none.

21      KKM's position is that we have not replaced any

22 nonconforming, defective, or out of specification barrels.

23      And ultimately, I think what the Court correctly

24 pointed out that a lot of what this comes out to is disputes

25 about the facts and varying interpretation of the evidence, but

1   this isn't a situation where KKM can be to compelled to produce

2   something that its representative does not have.

3           THE COURT:  Number 23, any customer complaints

4   regarding 1911 or 2011 pixel barrels.

5           Now, this, of course, if this has no responsive

6   documents to produce, what your answer was that this request is

7   broader than just for documents.  What about oral complaints or

8   you said you do a lot of business on the telephone.

9           Are there any records or documents that document those

10  telephone calls?

11          MR. MARI:  No, Your Honor.

12          And I wrote that comment down that oral -- earlier

13  that the Court made and I would agree that if an oral complaint

14  was made and then reduced to writing that would be responsive.

15  But, otherwise, there is nothing responsive.  So the answer to

16  that would be they have considered it and the answer is, no,

17  there is no record.

18          THE COURT:  Give me one moment.

19          Number 25, copies of documents communications

20  published by KKM regarding the type of (inaudible).  And

21  they're talking really about, like I said, this goes to the

22  heart of their case.  What representations did you make on your

23  website or pamphlets or other --

24          MR. MARI:  On the website we have produced the current

25  copy of the website, which this gets into another request, but

1  the previous versions of the website are not available because

2  the company went out-of-business and is unavailable.

3          KKM has asked its current website provider if any

4  current versus is available and their response was no.  So what

5  has been produced is the certification and the letter which

6  talks about the types of a steel that KKM uses, but to the

7  extent that anything from representations from an old version

8  of the website, that's not available today.

9          THE COURT:  And the original web designer, or whatever

10  you want to call it, is out-of-business or is just not

11  available.

12          MR. MARI:  I have the name of the businesses.  They

13  are no longer available.

14          THE COURT:  What is the name of the business?

15          MR. MARI:  One second, Your Honor.  Zoo currently they

16  use a company called media x-ray -- no I'm sorry.  I have this

17  -- the old company is -- well, my notes aren't clear, the two

18  names of the company are Darke Media and Dark has an "E" at the

19  end.  It's not clear from my notes.

20          THE COURT:  The old one as to --

21          MR. MARI:  Yes, correct.

22          THE COURT:  Has your client been in touch from the

23  previous company to see if by chance they have records?

24          MR. MARI:  I believe so.  I know the owner has spoken

25  to the current company to see if any of that data or its

1  previous version is harvestable, but I don't want to

2  misrepresent to the Court and say for certainty he has tried to

3  reach this old company or if he even has contact information

4  for that previous company.  I do not know the answer to that.

5       THE COURT:  Okay.  According to what Mr. Yee said, you

6  did give him a part of the website, but it was only certain

7  portions regarding frequently asked questions, but not anything

8  having to do with your advertising practices.

9       MR. MARI:  I don't know that -- if that's what Mr. Yee

10 said, I don't think that's one hundred percent correct.

11      We produced our entire website as it is today which is

12 available.  Any previous iterations are not available, but the

13 entire -- and I think what he was saying -- and Mr. Yee, you

14 can correct me if I'm wrong, is that the majority of what was

15 produced on the website was FAQs and that was probably the bulk

16 of the website, but that's not the only thing.  We have

17 produced for the entire website as it is today.

18      THE COURT:  And the certification sheets that you

19 referred to in your response here in the JSR, those

20 certification sheets are the certification sheets from the

21 underlying field manufacturer, or whatever you want to call it,

22 Carpenter and Otucomfu.

23      MR. MARI:  That's correct.

24      THE COURT:  Okay.  They're not yours.  They are the

25 original manufacturer, for lack of a better word?

1    MR. MARI:  Right.  And I think we could have not

2  produced that, but in the interest of full disclosure and

3  cooperation amongst the parties it was produced.  And that is

4  ultimately the (inaudible) that is used by KKM.  You are

5  correct, though.  That's not KKM's, something they generated or

6  created.

7    THE COURT:  All right.  Next we get to talk about your

8  website on request number 26 and SCI related to your website

9  and any changes to that from January 2017 to the present.

10    MR. MARI:  And that's what I was just explaining.

11    What is available today with the current company has

12  been produced.  Anything before that with the prior company

13  that is now dissolved and out-of-business, the current company

14  says they cannot access it.

15    THE COURT:  Okay.  That takes care of our first

16  motion.  Let's go to ECF 95-1, 2, and 3 and these all deal with

17  ECF number 86, the next motion.

18    Let's start with 95-1, which is Plaintiffs' motion to

19  compel KKM's better responses to the second request for

20  production and the second request for admission comes later, I

21  think.

22    MR. MARI:  Yes.

23    THE COURT:  The second request for production and

24  let's just deal with the purchase and sale by KKM of BQ-5 steel

25  and 416-R steel and then its own sales of barrel made of the

1  same material.

2      I'm not sure I understand your position with these.

3  These seem pretty easy to me.  What were the sales of barrels

4  made from BQ-5 steel?

5      MR. MARI:  Yes, Your Honor.  Sorry.  I didn't mean to

6  interrupt.

7      THE COURT:  No, that's okay.  I just don't understand

8  why that is such a difficult request.

9      MR. MARI:  The answer is none before 2020 and we tried

10  to add additional context to that.  There were no sales,

11  consumer sales or private sales.

12      Before 2020 the only use of BQ-5 that KKM had was

13  through a test production at the request of the U.S. Army

14  Marksmanship Unit in which other than testing to confirm the

15  Rockwell hardest test at KKM and then sending those test

16  barrels to the U.S. Army, it had no other involvement.

17      It wasn't a sale.  There was no mass production.

18  There was no followup order by the U.S. Army.  So, ultimately,

19  the answer is there is no BQ sales, test results, anything like

20  that before 2020 because KKM did not use BQ-5 steel other than

21  that one extremely limited circumstance at the request of the

22  U.S. Army.  And again, that wasn't a sale and there was no test

23  results in connection with that.

24      THE COURT:  You've got to back up.  You have to go

25  back up and go to basics.  Request number 1 doesn't ask you for

1 test results.  It just asks you for invoices and records.

2         MR. MARI:  Ultimately, Your Honor, there is none.

3 There is no exchange of payment for BQ-5.

4         Just to be clear, we have produced documents after

5 2020 because that's when BQ-5 stated being used by KKM, but the

6 dispute that the Plaintiffs seem to have is that prior to 2020

7 they seem to believe that BQ-5 was used at least or regularly

8 and we've responded and explained that that's not the case.

9         So we have produced documents regarding BQ-5 in

10 response to number 1 for 2020 and after.  The dispute seems to

11 be on some text messages from SCI's employee, which is not

12 someone associated with KKM referring to potentially prior BQ-5

13 materials used.

14         And a couple of issues with that are one that is

15 unverified.  Two, we don't know the basis of that employee's

16 knowledge or if it is trustworthy, but ultimately KKM has

17 endeavored to explain the entirety of its use of BQ-5 before

18 2020.

19         So, really, I think this dispute really on the BQ-5

20 issue is that they believe there are materials out there and we

21 have responded there are none and the only involvement with

22 BQ-5 is that limited interaction with the U.S. Army and there

23 is no records of that.

24         THE COURT:  All right.  There are no invoices or

25 purchase orders dealing with BQ-5 in 2020 dealing with the

1   military is what you are telling me?

2           MR. MARI:  Prior to 2020.

3           THE COURT:  2016 to the present.  That includes 2020.

4           MR. MARI:  We produced everything 2020 and after once

5   they started using BQ-5.  The only use of BQ-5 before that was

6   that single instance with the U.S. Army.  And from what I

7   understand the Army sent a 12-foot piece of steel and asked for

8   these test barrels.  Once however many barrels were made they

9   were shipped back to the U.S. Army and that was the end of it.

10  There was no payment.  There is no invoice.  There is no

11  testing data and again that's all pre-2020.

12          THE COURT:  Okay.  Next is number 2, sales of

13  19/10/20 barrels made from (inaudible) 416-R.

14          MR. MARI:  And this gets into the 416 versus 416-R and

15  restricted issue, which I think the Court correctly pointed out

16  that this is a question of fact.

17          They may not like KKM's nomenclature or the way they

18  label steel, but ultimately whether KKM considers it to be

19  416-R or 416 restricted it doesn't make this answer untruthful.

20  So we have responded to this and actually the clearest

21  explanation -- and I'm jumping ahead a little bit here.

22          Second request for admissions number 95-3, request

23  numbers 2, 4, and 6, KKM specified its exact specifications for

24  a request for 416 steel.  So KKM places its restrictions on

25  steel and considers it 416-R and 416 restricted.

1          Again, the fact that Plaintiffs may not agree or may

2   not like that does not change that this is a disputed issue of

3   fact.

4          THE COURT:  Right.  Which makes the discovery so much

5   more relevant.

6          MR. MARI:  And we've produced documents.  They just

7   claim that the documents that we have produced are unresponsive

8   because they don't say 416 restricted or 416-R and our position

9   is that is not the end-all be all.

10          The restriction themselves placed on the steel by KKM

11   make it, in KKM's opinion, 416-R and 416 restricted.  So this

12   isn't a situation where they're asking for something and we're

13   saying none.  The parties have varying interpretations of the

14   materials produced.

15          THE COURT:  Right.  Of course I'm looking at a request

16   for production and your response really is more akin to an

17   interrogatory response.  So what is your answer to request for

18   production number 2?

19          MR. MARI:  We have produced documents that show the

20   certification sheets.  So those are the records of the steel

21   received to make these barrels in the request.

22          THE COURT:  Which say 416 and those are the ones that

23   we talked about previously?

24          MR. MARI:  Most of them.  Some of them say 416-R, but

25   ultimately that is what the Plaintiffs are taking issue with

1  what we produced in their opinion does not support their

2  version of events.  So this is a dispute about the items that

3  are produced.

4        But what we have said in our response is ultimately

5  these are issues that seem like summary judgment or issues of

6  fact for a jury whether or not it truly was 416-R, or 416

7  restricted, or 416 steel.

8        But what we have produced are the steel and the

9  invoices and the certifications for the steel that KKM used.

10       THE COURT:  Well, is it fair to say that if I were to

11 ask you to amend this response, you would say that you have to

12 do all documents in your possession responsive to this request?

13       MR. MARI:  Yes, Your Honor.

14       THE COURT:  Okay.  Next is number 3, purchase of BQ-5

15 steel 2010 to the present.

16       MR. MARI:  So KKM responded that we produced documents

17 from 2020 to the present, which I explained that it started

18 utilizing BQ-5 steel.  The Plaintiffs are taking issue and

19 saying that there should be things previous to this.  And KKM

20 is responding that there are no records prior to 2020 and we

21 have produced everything responsive from 2020 on.

22       THE COURT:  Give me one moment.

23       Next is request number 4 produced (inaudible)

24 documents related to purchase of the 416.  Same question as

25 (inaudible).

1        MR. MARI:  That's correct, Your Honor, and we've

2   produced the documents.  The Plaintiffs don't agree with our

3   interpretation of the documents produced, but we have produced

4   everything that KKM has in its possession and in its opinion is

5   responsive to that request.

6        And when I say in its opinion, based on the differing

7   positions with respect to 416, 416-R, and 416 restricted.

8        THE COURT:  What about Plaintiffs claim that you

9   produced nothing from 2010 to 2014?  I think I heard that.

10        MR. MARI:  There was discussion about that, but I

11   don't think it was from this request.  I can pull up the

12   certification and see the dates on there.

13        To the extent, I guess to short-circuit this and to

14   save everybody some time, to the extent that there are any

15   certifications that date back to 2010 to 2014 and they are in

16   KKM's possession, we agree to produce them.

17        Without going through my file and looking at the dates

18   on those certifications, which I could do if the Court would

19   like, I don't know.  They may go back that far.

20        To the extent they didn't, my assumption is that it is

21   not in KKM's possession.  But, like I said, if there is

22   something we would agree to produce it.  I'm happy to go back

23   and triple-check that.

24        THE COURT:  All right.  That takes care of that with

25   this next motion.  Let's turn to Plaintiffs' motion to compel

1   production from KKM.

2          MR. MARI:  I'm there.

3          THE COURT:  Request number 2, sales records not from

4   416-R steel.

5          MR. MARI:  And again, this gets into a dispute about

6   facts.  We've responded there are none because KKM's barrels

7   were 416-R.  So that is the response.

8          THE COURT:  Number 7, any studies regarding BQ-5 and

9   that's at (inaudible) was appropriate for the 1911-barrel.

10         MR. MARI:  And again, the answer is none.  There are

11  none and that is what we responded.

12         THE COURT:  Okay.  To compel to second request for

13  admission to KKM and with reference to 2, 4, and 6 you denied.

14         MR. MARI:  Correct.

15         THE COURT:  With reference to 10 you denied.  That's

16  it.  You responded to those.

17         MR. MARI:  I responded and the first three there were

18  the explanation of why we denied it and not just an outright

19  denial.  Again, this goes to the 416, 416-R, and varying

20  interpretations and disputed issues of fact.

21         THE COURT:  Right.  That takes care of that one.  Let

22  me get this motion up.  The next one is -- before we go to the

23  next one, let's address quickly Plaintiffs' argument that KKM

24  failed to totally respond to the first request for production

25  and the first request for admissions.

 1          MR. MARI:  So the first request for production we

 2    responded to and that has been the subject of the motion to

 3    compel in the hearing today.  The first request for admissions

 4    I will say this that I do not know and I do not want to

 5    represent one way or the other to the Court because I don't

 6    have a definitive answer.

 7          I did not see that as part of the status report.  I

 8    saw that in KKM's response, which is docket 86.  We have taken

 9    issue with the fact that -- I'm sorry.  Not 86 -- ECF 92.  That

10    although the motion to compel makes passing reference to a lack

11    of response for the first request for admissions.

12          Plaintiffs' haven't asked for any relief or filed a

13    motion to compel with respect to those request for admissions.

14    So I don't think that's properly before the Court today, but I

15    do not have any further information.

16          I'm going to look into that as soon as we get off this

17    hearing.  So I don't want to represent to the Court that we

18    have responded when we may not have, but for purposes for today

19    I don't think that issue is properly before the Court.

20          THE COURT:  I think the Plaintiffs were saying in

21    response to that based on what they said to the SCI request for

22    relief is that Rule 36 is self-executing and they didn't have

23    to file a motion to compel.

24          MR. MARI:  And then, to the extent that's true we

25    would potentially need to file a motion to seek relief for

1   that.  But, again, I don't want to misrepresent anything to the

2   Court here.  I don't know that responses were or were not

3   served, but for purposes of today I don't think Plaintiffs have

4   properly moved to compel or admit the first request for

5   admissions.

6           THE COURT:  Now, let's turn to the second request for

7   admission and thank you for reminding me that that issue was

8   still out there and that's ECF 95-4 Pages 1 through 11.

9           This deals with -- and this is SCI a second request

10  for admissions for SCI.

11          MR. MARI:  So if the Court has no more questions for

12  me, I will go ahead and mute myself.

13          Thank you, Your Honor.

14          THE COURT:  Okay.  Thank you.  And I will be hearing

15  from Mr. Benford on this one?

16          MR. BENFORD:  Yes, Your Honor.  Good afternoon, again.

17  John Benford on behalf of SCI.

18          Your Honor, as we indicated in our response, Courts

19  have held that if an answer or two request for admissions

20  (inaudible) the responding party should be allowed to amend its

21  answers and the Court should only impose a severe sanction

22  deeming the request admitted if that responding party

23  intentionally disregarded its obligations.

24          In addition, Courts have held that an insufficient

25  answer should not be deemed admitted if it is contrary to a

1   resolution on its merits.

2          As we state in our response, SCI timely responded to

3   Plaintiffs' second request for admissions and stated that it

4   was unable to answer the request after reasonable inquiry.

5          And as explained in the response SCI is a retailer of

6   firearm parts and products, it sells approximately 4,000 parts

7   and products that are manufactured by approximately 200

8   manufacturers.  So it doesn't have personal knowledge of the

9   manufacturing process that is used by these manufacturers.

10          Whether the 416 are a type steel that was used is a

11   complex issue.  It requires expert knowledge of the

12   metallurgist expert and with SCI initially answered its request

13   for admissions back on May 18th.

14          This issue would still be -- SCI, KKM and SCI's

15   expert, a metallurgist, enjoined and retained by both KKM and

16   SCI, his report, Dr. Slanger (phonetic) wouldn't be due for

17   another six weeks.  So at that point, Dr. Slanger had not

18   formed his opinion on this issue.

19          Now, although, regardless when the Plaintiffs raised

20   this issue, first raised this issue with SCI, as a matter of

21   good faith even though we stated and we had a good faith basis

22   because the expert was still six weeks away from finalizing his

23   opinions on the 416-R issue, we agreed that we would conduct

24   additional inquiry.

25          And again, this is all pursuant to 7.183.  So we

1  agreed that we would conduct a further inquiry and attempt to

2  obtain the necessary information so we could amend this answer.

3  We did that and SCI amended its and answer and served an

4  amended answer on June 21st, which is at docket 90-10.

5          Now, in the alternative we are respectfully requesting

6  that SCI be allowed to amend its answer as it did back on June

7  21st.  And as we indicate in our response in determining that

8  an amendment is warranted the Court should consider whether an

9  amendment serves the presentation of the merits and whether it

10 will prejudice the party who obtained the admissions.

11         Regarding the presentation of the merits the first

12 issue --

13         THE COURT:  Well, let me ask you a question.  I'm

14 sorry, Mr. Benford, let me interrupt for a second.  I'm a

15 little confused.

16         What I see in the JSR 95.4, I think is your amended

17 response.  Is there an issue as to whether or not Plaintiffs

18 are accepting your amendment?  I'm missing something.

19         MR. BENFORD:  Plaintiffs are rejecting our amendment,

20 which really is fairly confusing because this is exactly what

21 we agreed.  We agreed that we would conduct a further inquiry,

22 which we did.  And we served an amended response to the second

23 request for admission on June 21st.

24         THE COURT:  And the second response are the response

25 of the denial that are reflected in the 95-4; is that correct?

1    MR. BENFORD:  Correct.  Their denial that to even as

2    Your Honor pointed out, the even number request between 2 and

3    50, correct.  And again, that's in the record at docket 90-10.

4    Those are our amended response which, again, we served on

5    June 21st pursuant to 7.183.

6        THE COURT:  Right.

7        MR. BENFORD:  So we were surprised because we

8    understood this issue to be resolved.  So we were surprised

9    that Plaintiffs went ahead and filed this motion to deem the

10   original response admitted when we had, in fact, amended the

11   original response and denied --

12       THE COURT:  When I spoke with Mr. Yee, when we had our

13   discussion he did not bring that up.  So I was assuming that

14   wasn't an issue any longer and that he had accepted your

15   amended responses in this particular motion.  Let me break my

16   own rule for a minute.

17        Mr. Yee, back to you for a second.

18       MR. YEE:  Yes, Your Honor.

19       THE COURT:  So is this an issue or not?  I assumed it

20   wasn't.

21       MR. YEE:  So it was an issue at the time when SCI

22   filed their amended response by denying it.  But again this

23   goes to the heart of that 416-R issue, Your Honor.

24        We had presented information to SCI showing that the

25   barrels at KKM, the steel that they were using, none of the

1  certification show that it was 416-R steel.  All of the

2  certification was for straight 416 and that's why the issue

3  with their denial.  But for purposes of this motion when you

4  and I addressed it, like you said the Defense will live and die

5  by their answers.  So, yes, we did take issue initially but

6  based on our discussion --

7         THE COURT:  That just helps see where I am with Mr.

8  Benford.  All right.  Thank you.

9         All right.  Mr. Benford back to you.  Let's look at

10 the 95-4.  You amended your answers and those are the ones that

11 are being accepted and we are going to work from that forward.

12        So with reference to the even numbers you have

13 outright denied those, correct?

14        MR. BENFORD:  Yes, Your Honor, that is correct.

15        THE COURT:  And the same thing for I believe number

16 53, you admitted it with an objection that I will, like I said

17 before, probably overrule.  So it is going to start with SCI

18 admits that it removed the above cited language.

19        So you have an admission and you have a denial.  So

20 you are complying with Rule 36.  I want to talk to you only

21 about numbers 52, 55 and 56, okay.

22        MR. BENFORD:  Yes, Your Honor.

23        THE COURT:  Now, there what you are telling the Court

24 is that -- and this is what was on your advertisement.

25        In 2016 the advertisement, according to the

1  Plaintiffs, said it had information about it being 416

2  stainless steel and the Rockwell -- I don't know --

3  classification of 42 to 45 and then have it changed after that

4  in 2017 to 2019 and it no longer and then from 2017 to 2019 it

5  no longer mentioned the Rockwell hardness.

6          That is the three ones at issue and your response is

7  that you conducted a reasonable inquiry.  And based on the

8  information that you have or could readily obtain, you don't

9  have sufficient information to admit or deny it, correct?

10         MR. BENFORD:  That is correct, Your Honor.

11         THE COURT:  I want you to tell me what was that

12 reasonable inquiry?

13         MR. BENFORD:  Well, SCI is a small company.

14         It does not maintain copies of its previous website

15 including product description.  So it does not have copies.

16         In the ordinary course of its business it does not

17 maintain copies of previous websites.  It is constantly

18 changing information that is supplied by its manufacturers.

19 When the manufacturers notify it that information needs to be

20 updated as part of its ongoing business it will change the

21 descriptions.  SCI will.  Not its IT person, but SCI will and

22 it does not maintain copies of --

23         THE COURT:  I get that.  You don't have copies or SCI

24 does not have copies, but my question is, you know, pretty much

25 the same question I asked rhetorically when it was Mr. Yee's

1   turn, which is has SCI contacted the third party web designer

2   to determine its previous versions of the website can be

3   retrieved?  According to Mr. Yee, Mr. Bradley said no.

4        MR. BENFORD:  Mr. Bradley testified that SCI's IT

5   person does not make these changes to product descriptions.

6   These ongoing regular changes to product descriptions.  SCI,

7   including Mr. Bradley, makes these changes on a regular basis,

8   but doesn't keep copies of the changes.

9        And SCI's key person doesn't maintain copies of the

10  changes.  Including the SCI product descriptions.  They may

11  have prior versions of the website that's better changed from

12  time to time, but the website, the prior versions of the

13  website aren't going to contain these product descriptions.

14       Now, they can certainly make that inquiry and they can

15  double-check with the IT person.  And we can certainly submit

16  to the Court a declaration from the IT contractor or vendor as

17  to, you know, whether these prior versions of the website --

18  and again, it is my understanding that the website is only

19  changed on a pretty infrequent basis as opposed to the actual

20  product descriptions, which are changed on a regular basis.

21  And which, again, SCI doesn't keep a copy of the changes,

22  including the substance of the change, the date the change was

23  made, or that type of thing.

24       So, you know, SCI can certainly ask or double-check

25  with its web designer.  I guess it's a web designer.  It's an

1   IT person as to whether they would have this information, but

2   according to Mr. Bradley, SCI's IT person doesn't keep or

3   record these types of changes.  The system doesn't record these

4   changes.

5           THE COURT:  All right.  Let's go turn to the last

6   motion which also deals with SCI.  So that will be you.

7           MR. BENFORD:  Correct.  Thank you, Your Honor.

8           THE COURT:  This deals with the first request for

9   admissions.  This is your motion, Mr. Benford, asking that the

10  Court not deem your answers admitted because of this

11  inadvertent failure to serve the Plaintiffs back in February of

12  2022.

13          MR. BENFORD:  That is correct.  Sure.

14           And Your Honor, as you pointed out, we're asking that

15  the Court deem the answers to the first RFAs timely served or

16  in the alternative allow SCI to withdraw the technical

17  admissions and re-serve the answers to the RFAs which we did

18  back on June 13th.

19          THE COURT:  I'm sorry.  To be clear, would you be

20  re-serving the same answers or would you be seeking to change

21  the answers?

22          MR. BENFORD:  The same exact answers which, again, we

23  served back on June 13.  Your Honor, we are just asking that

24  the technical admissions be removed based upon this clerical

25  error.  We believe this is a clear inadvertent clerical error.

1            SCI, John Chiocca, co-counsel with Cole Scott and

2    Kissane, his office timely served the answers to the RFAs on

3    all parties on February 7th with the exception of Plaintiffs.

4    And the motion that catches the declaration of Mr. Chiocca,

5    legal assistant, Melissa Benson, who served the answers.  And

6    she testified in her declaration that she intended to serve

7    them on Plaintiffs and she attaches the e-mail showing her

8    intent to serve the answers on February 7th.

9            The service, the e-mail is a service e-mail.  It

10   states service of court documents.  And the form of the e-mail

11   is the type of e-mail that is used to serve documents.  So it

12   was clearly an intent to serve these answers to the first RFAs

13   back in February.

14           In addition, Plaintiffs did not mention the fact that

15   they didn't receive these answers to the first request for

16   admissions until June 11th, which is four months after they

17   were due.  Again, no communications from Plaintiffs.  No

18   followup.  Not even a single e-mail saying are you guys ever

19   going to respond to these.

20           So when this issue was first raised by the Plaintiffs

21   on June 11th we immediately served or we immediately sent

22   Plaintiffs on the responses which, again, Plaintiffs were

23   inadvertently left omitted when they were served back on

24   February 7th.  So this is something that we immediately

25   responded to.

1              Courts have held that a withdrawal or an amendment to

2    an answer for request for admissions should be allowed.  Again

3    the presentation of the merits of the action and it doesn't

4    prejudice the requesting party.  In addition Courts have also

5    held that relief of technical omissions there is a mistake that

6    we believe there was a clear mistake here and the mistake was

7    diligently detected, which it was.

8              And again, immediately after discovery of this

9    clerical error, SCI served Plaintiffs with the answers that it

10   intended to serve on the Plaintiffs back in February.  When SCI

11   had filed this motion -- and this goes to the prejudice.

12             When SCI had filed this motion, Plaintiffs had not

13   taken any depositions and Plaintiffs have still not taken the

14   deposition of the Defendants' expert metallurgist.  And most of

15   the issues that are addressed in this first request for

16   admission deal with metallurgy including the type of steel.

17             In addition, Plaintiffs have not taken the deposition

18   of any of KKM's representatives or SCI's 30(b)(6) corporate

19   representative.  So certainly with respect to the prejudice

20   issue, Your Honor, we believe there is plenty of time left to

21   take additional depositions on these issues.

22             On the other hand, deeming these requests admitted

23   based on a clerical error we believe would unfairly prejudice

24   SCI.  It would be admitting material issues that could render

25   SCI liable on a number of issues.  So we would respectfully

1  request that the Court grant our motion.

2         Thank you, Your Honor.

3         THE COURT:  All right.  Thank you very much.

4         I'm going to give Mr. Yee five minutes for rebuttal

5  and I am really going to stick to the time because we are well

6  over.  Luckily, I am on criminal duty, but nothing came in.  So

7  we got super lucky.  So five minutes.

8         MR. YEE:  Thank you, Your Honor.

9         This is Attorney Yee.  Just a few rebuttal comments.

10  I don't want to take up too much of your time because we have

11  addressed a lot of the arguments already this afternoon.

12         But regarding Mr. Mira's comments and regarding the

13  joint testing protocol, they indicated that they have not

14  received a protocol from Plaintiffs.

15         Again, this is something that Defense counsel

16  indicated that they would establish as they wanted to control

17  it.  And if requested by the Court, Mr. Fiato and I could

18  produce e-mails where Mr. Fiato and I practically begged them

19  for over a year for this joint testing protocol where Mr. Mari

20  indicates that somehow this was our responsibility is false.

21         He was not even involved in the initial conversation

22  back in May of '21 where it was discussed.  And then, finally,

23  after their expert contacted our expert, finally in October of

24  '21 they indicated they would put together the protocol.  So to

25  kind of put that on us I think would be a little insincere.

1              Regarding the issue with the Nevada Heat Treat

2    documents, although Mr. Mari indicated that they would ask for

3    it, I want to clarify.  You know, he makes a lot of issue about

4    us and the proper way to get it is to subpoena Nevada Heat

5    Treat, which we did and he indicated that it was incumbent upon

6    us to go and get it.

7              Mr. Fiato and I did speak with counsel for Nevada Heat

8    Treat who indicated to us that all the information that we were

9    looking for was already in the possession of KKM and that it

10   would be a burden on them to produce the stuff that we could

11   get from a party in the case.

12             So at that point in time we approached Mr. Robinson

13   who indicated that he would get it.  And as you pointed out,

14   Your Honor, although Mr. Robinson was very cooperative and

15   reasonable, he didn't execute and we're still waiting for it

16   and we're still waiting for it today.

17             Regarding this issue about the use of the BQ-5 not

18   until mid 2020.  Again, I point the Court's attention to, you

19   know, Mr. Mira indicates that we have no evidence showing that

20   there was any indication that KKM didn't use BQ-5 prior to

21   mid-2020.

22             Again, I point the Court to the January 9/2020 public

23   letter that KKM wrote and had Shooters Connection posted on

24   their Facebook page that told the public in January of 2020

25   that they used steel that was BQ-5 steel.

88

1        Mr. Mari takes issue with it and said that we never

2   sold it to the public and it was only a military thing.  And he

3   indicates that there are no records of these barrels going to

4   the military.  They're doing business with the U.S. Government

5   and they want the Court to believe that there are no records of

6   this?

7        And quite frankly, the ultimate letter disputes their

8   own assertion that they didn't use the BQ-5 until mid-2020 when

9   in January of that year they are already telling the public

10  that they are using BQ-5.

11       Regarding the certs, Mr. Mari indicated that some of

12  the certs indicate 416-R.  That's actually untrue.  Every

13  single steel certification provided through discovery from

14  Otucomfu and Carpenter all say 416 and only 416.  There are no

15  certs that say 416-R.  That's an inaccurate statement.

16       Regarding the first request for admissions, Mr. Mari

17  indicated that the Plaintiffs have not filed a motion to compel

18  or some type of motion to have them deemed admitted.

19       As Your Honor correctly pointed out, it is a

20  self-executing rule.  It's not incumbent upon us to do anything

21  with that.  It is deemed admitted if you fail to answer.

22       The same goes to the assertion to Mr. Benford

23  indicating that we didn't take issue to the fact that SCI

24  hadn't responded to the first request for admissions either by

25  February 7th of 2020.

1          And the reason for that is, Your Honor, at that

2     particular point in time our discovery had already been served

3     almost a year earlier.  We hadn't received a single response to

4     any of our earlier requests to produce.

5          Albeit in their defense because the joint motion to

6     dismiss was still pending by the Court, we didn't pressure

7     them.  But the point is, Your Honor, we had served discovery

8     requests.  We had served requests to admit.

9          And when the due date came due, we hadn't at that time

10    receive a single discovery document and did not receive

11    responses to the first request for admissions by either KKM or

12    SCI.

13         So why would that seem funny to us to pressure SCI for

14    that?  They make it sound like it was incumbent upon us to make

15    noise about it when at that particular point in time they

16    didn't produce a single discovery document.

17         Mr. Benford also takes issue and makes reference that

18    we haven't deposed their expert metallurgist.  Well, quite

19    frankly, Your Honor, their expert metallurgist report, the

20    disclosure was supposed to be provided by the Court's

21    scheduling order by May 5th of this year.  They didn't provide

22    any disclosure of him until June 30th in the form of a rebuttal

23    report, which is a subject of another debate.

24         By not disclosing their expert on May 5th, it

25    practically took away our ability to provide a rebuttal by

1  June 30th and we're still discussing that.

2          But for Mr. Benford to indicate that we haven't

3  deposed their expert.  That's true.  We didn't know about him

4  until June 30th when they provided that report.  So we are just

5  now setting up depositions of most of the key fact witnesses,

6  which many of them are scheduled.  But, yes, we haven't

7  scheduled that deposition yet because we didn't know about him

8  until June 30th.

9          Mr. Benford also indicates that we haven't even

10  deposed the KKM representative.  I hate throwing people under

11  the bus but, again, Mr. Robinson being reasonable and

12  cooperative indicated to us months ago that he would get us a

13  deposition date for Mr. McIntyre, but we just got a date for

14  Mr. McIntyre maybe three weeks ago.

15          So, you know, if Defendants want to portray the

16  situation that the Plaintiffs are kind of sitting on their

17  hands in this case and that's absolutely not true, Your Honor.

18          And again, as I mentioned, the overall theme of these

19  motions that, you know, this law suit and discovery is supposed

20  to be a search for the truth.  What we are faced up against at

21  this point with the close of discovery just around the corner,

22  as you mentioned about a month away, we feel that the

23  Defendants have been less than cooperative in executing on

24  their promises to provide testing protocols and to get

25  documents.

1        You know, Mr. Benford, just made an argument about the

2   web guy who created the SCI doesn't make the changes.  Well, we

3   are not asserting that he did.  Maybe he did or didn't.  But

4   the point is Mr. Bradley didn't even bother to call the

5   gentleman to ask, hey, I know you didn't make the changes, but

6   since you created it, is there a way that this system can go

7   back in time and see from a technical standpoint prior

8   versions?  He didn't even make that call.  So, again, it is the

9   overall theme of the lack of execution, Your Honor.

10       Therefore, we would ask that the Court provide the

11  Plaintiffs some relief here in forcing the Defendants to

12  provide discovery that is long overdue or to provide answers to

13  discovery that we have been seeking.

14       THE COURT:  Thank you.

15       What I'm planning to do is the following.  We're going

16  to take a break because we have been at this for a long time.

17  And during that break I'm going to reflect on your arguments

18  and review my notes.

19       And then, we will come back from the record and I will

20  rule from the bench.  I will rule orally.  I don't plan to

21  write a long order, but rather a short paperless order that

22  will refer you back to whatever ruling I make on the record.

23       So if you want a copy of my ruling, I ask that you get

24  a copy of the transcript.  And you can do that by contacting

25  the clerk here in Fort Lauderdale.  So let's take a 15-minute

 1  break.  It is now 4:35.  So let's come back at -- let me look

 2  at the time.  So let's come back five to and if I need a little

 3  bit more time, I will let you know and then I will rule from

 4  the bench.

 5         In the meantime, I am going to ask that you put the

 6  line on hold or mute yourselves.  I'm going to go into another

 7  room.  So I won't be here with you.  I will stop the recording

 8  so if you want to conduct any chit-chat, you won't be on the

 9  record.  So let's do 20 minutes.  So 4:55.  Let me stop the

10  recording now.

11         MR. YEE:  Thank you, Your Honor.

12  (Thereupon, the proceedings resumed:)

13         THE COURT:  Gentleman, this is Judge Valle again.  We

14  are reconvening.  It is now 4:56.

15         Recalling the case of Akai Custom Guns versus KKM;

16  case number 20-cv-61469.  I am confirming that everyone is on

17  the line.  So if the Plaintiffs could put their appearance on

18  the record.

19         MR. YEE:  Good afternoon, Your Honor.

20         This is Attorney Edmund Yee on behalf of the

21  Plaintiffs.

22         MR. FIATO:  Good afternoon, Your Honor.

23         This is Attorney Richard Fiato on behalf of the

24  Plaintiffs.

25         THE COURT:  And for the Defense?

1        MR. MARI:  Good afternoon, Your Honor.  This is

2    Nicolas Mira on behalf of KKM.

3        MR. BENFORD:  Good afternoon, Your Honor.  This is

4    John Benford on behalf Defendant SCI.

5        THE COURT:  All right.  Thank you, everyone.

6            So we have everyone back on the record.  I am now

7    ready to rule from the bench.  As I said before, I am not going

8    to do a lengthy written order, but will rely just on my

9    findings and enter a paperless order that basically says for

10   the reasons stated on the record, the motion is denied,

11   granted, et cetera.  So if you need a transcript make sure you

12   get one.

13           All right.  My ruling today is framed by the following

14   legal principles.  First, under Federal Rule of Civil Procedure

15   2061, the parties may obtain discovery regarding any non

16   privileged matter that is relevant to any party's claim or

17   defense and proportional to the needs of the case considering

18   the importance of the issues at stake in the action, the amount

19   in controversy, the parties' relative access to relevant

20   information, the parties's resources, the importance of the

21   discovery in resolving the issues, and whether the burden or

22   expense of the proposed discovery outweighs its likely

23   benefits.

24           Further, under the Federal Rule, a party may request

25   the production of any documents and make requests for

1  admissions that fall under Rule 26(b) pursuant to Federal Rules

2  of Civil Procedure 34(a) and 36.

3          Moreover, Rule 26(b) allows discovery through the

4  increased concept of proportionality and I'm citing to *In Re*

5  *Decata Air Bag Litigation,* Seventh District of Florida,

6  March 1st, 2016.

7          If an opposing party objects to the request for

8  production, the requesting party may then file a motion to

9  compel production pursuant to Federal Rule of Civil Procedure

10  37, but only after conferring with opposing counsel in good

11  faith to resolve the issues in dispute without Court

12  intervention.

13          The Federal Rules afford the Court broad authority and

14  discretion to control the scope of discovery.  *Defendants v.*

15  *Wall To Wall Residence Repairs,* Eleventh Circuit, 2011.  And

16  they strongly favor full discovery whenever possible.

17          Citing to *Farmsworth v. Proctor And Gamble,* Eleventh

18  Circuit, 1985.  Accordingly, Courts employ a liberal and broad

19  scope of discovery in keeping with the spirit and the

20  (inaudible) of these rules.

21          Citing to *Rosenbaum v. Becker and Poliakoff,* Southern

22  District of Florida, 2010.  The overall purpose of discovery

23  under the Federal Rules is to require the disclosure of all

24  relevant information so that the ultimate resolution of a

25  disputed issue in any civil action may be based on a full and

1  accurate understanding of the true facts and, therefore, embody

2  a fair and just result.

3        And that is a quote from *Shapiro v. Dynamic Recovery*

4  *Solutions,* Seventh District of Florida, July 26th of 2018.

5  Accordingly, when a party objects to discovery, the onus is on

6  the objecting party to demonstrate with specificity how the

7  objection to the request is unreasonable or otherwise unduly

8  burdensome.  *Powers v. Target Corporation,* Southern District of

9  Florida, January 24th of 2020.

10       My ruling today is also framed by Rule 26(b)(2)(c),

11 which authorizes the Court to limit discovery if discovery is

12 unreasonably cumulative or duplicative, or can be obtained from

13 some other source that is more convenient and less burdensome,

14 or less expensive.

15       And I'm citing to *JDW Software v. Embroidery.com*,

16 Southern District of Florida, May 31st of 2011.  With these

17 principles in mind, I am going to turn to the specific motions

18 at issue starting with the request for production.

19       The first one that I'm going to turn to is Plaintiffs'

20 motion to compel complete and accurate answers.  The Plaintiffs

21 first request for production of documents from KKM and that's

22 at ECF number 80, the JSRs ECF number 95, Pages 1 through 18.

23       As to request for production number 1, I am going to

24 grant the motion to compel.  As discussed at the hearing today,

25 Defendants and the Plaintiffs will engage in a joint test --

1 | will develop and then execute a joint testing protocol that
2 | will resolve this particular request and they will mutually
3 | exchange barrels and this will include the Akai Thompson
4 | Sleeved failed barrel that is in the Defendants' possession.
5 |        As to request for production number 3, I am going to
6 | grant the motion to compel.  The Defendants will be required to
7 | amend its answer and if all responsive documents have been
8 | produced it should state so clearly.  If there are no other
9 | documents, it should also say so clearly.  So that is to be
10 | amended.
11 |        Request for production number 4 dealing with recalls,
12 | the Defendants have stated that it had not had any recalls.
13 | Therefore, requests for production number 4 will be denied as
14 | moot based on the Defendants' responses.
15 |        Request for production number 5, I will grant the
16 | motion to compel.  The Defendants to amend its response after
17 | confirming that the innovative testing system is not or does
18 | maintain test results.
19 |        Request number 6 dealing with recalls is denied as
20 | moot.  The Defendants have stated that it did not have any
21 | recalls.
22 |        Request for production number 7 is granted.  Once
23 | again, the Defendants are ordered to amend its response to
24 | clearly state that all responsive documents have been produced.
25 | And to the extent that any documents are received from Nevada

1   Heat Treat -- I'm sorry.  I forgot the name of the company --
2   Nevada Heat treatment, those documents will be produced by the
3   Defendants.

4          Request for production number 10, I am again going to
5   grant the motion.  Defendants are to amend its response to
6   clearly reflect whether all responsive documents have been
7   produced.  And also to clarify that once documents are received
8   from Nevada Heat Treatment, those documents are also to be
9   produced.

10         Request number 11, same as number 10.  Same ruling as
11  with number 10.

12         Request for production number 17, I am going to grant
13  the motion to compel.  Defendants are to amend its response to
14  clarify that all responsive documents have been produced.

15         If any documents remain that have not been produced,
16  subject to a claim of attorney/client privilege or any other
17  privilege or doctrine, then, the Defendants are to produce a
18  corresponding privilege log that complies with the requirement
19  of a proper privilege log.

20         As well, I want to clarify that this request for
21  production calls for the production of pre-suit communication.

22         Number 18, I am going to grant the motion, again.  The
23  Defendants are ordered to amend its response to clarify whether
24  all responsive documents have been produced and that there are
25  no others.  That includes e-mails and other communications and

 1  not just text, which was the subject of what we discussed

 2  today.  This request is much broader.

 3          So, again, Defendants' motion is granted.  Defendants

 4  will amend its response to clearly reflect whether all

 5  documents responsive to this request have been produced.

 6          Request number 21 is denied as duplicative.  Request

 7  for production number 3 is identical.  Request for production

 8  number 22 -- gentleman, am I going too fast?

 9          MR. YEE:  No, Your Honor.

10          MR. MARI:  No, Your Honor.

11          MR. BENFORD:  No, Your Honor.

12          THE COURT:  All right.  Thank you.

13          Request for production number 22 is going to be

14  denied.  I think that Defendants clearly responded to that

15  interrogatory.

16          Request for production number 23 is also denied.

17  Again, the Defendants clearly responded.  I'm sorry I said

18  interrogatory.  I meant request for production as to 22.

19          Defendants clearly responded to request number 23 as

20  well.  So that is denied.

21          As to request for production number 25, I am going to

22  grant the motion.  Once again, Defendants are ordered to amend

23  its responses.  If all responsive documents -- to reflect

24  whether all responsive documents have been provided.  If not,

25  then obviously these documents are to be provided.

1        In amending this response, the Defendants are to take

2    this opportunity to contact the previous company to make sure

3    that none of this has been preserved by the previous company,

4    whether it is Media X-ray or Darke Media.

5        Request for production number 26, I am going to grant

6    the motion to compel.  Defendants are to amend its answer.

7    Especially after contacting the prior company and then confirm

8    that all responsive documents have been produced and no others

9    exist.  That is the first motion.

10       Turning next to ECF number 86, and in particular to

11   the first Joint Status Report relevant to that motion, which is

12   at ECF 95-1, Pages 1 through 12.  The first one is Plaintiffs'

13   motion to compel accurate answers to Plaintiffs' second request

14   for production to KKM.  I am going to grant this motion to

15   compel.  Defendants are to amend its responses to clearly state

16   whether documents, all responsive documents, have been produced

17   and that no others exist.

18       In particular, as to request for production number 4,

19   Defendants will amend its response to include any information

20   that was omitted with reference to the years 2010 through 2014.

21       Turning next to JSR 95-2, Pages 1 through 8, this is

22   Plaintiffs motion to compel Plaintiffs' answers, better answers

23   to the third request for production for KKM.

24       Beginning with request number 2, the motion is denied

25   as to this request based on Defendants' clear response that it

1  had none.

2          Request number 7, the motion is denied as to request

3  number 7 given Defendants' clear response that it had none.

4          Turning next to 95-3, which is Pages 1 through 15,

5  Plaintiffs' motion to compel accurate answers to Plaintiffs'

6  second request for admissions to Defendants KKM, I will deny

7  this motion in full.

8          As I stated previously, Defendants have clearly denied

9  these allegations or at least request for admissions and the

10 case will be prosecuted and the Defendant will live and die

11 with those answers.  That takes care of that.  That takes care

12 of ECF number 86.

13         Turning to ECF number 90, the JSR at ECF 95-4, Pages 1

14 through 11, this deals with Plaintiffs' motion to deem matters

15 admitted or compel accurate answers to Plaintiffs' second

16 request for admissions to Defendant SCI and this correlates to

17 ECF number 90.

18         As to this particular request, I am going to deny the

19 motion as to what I called during the hearing the even 2

20 through 50, request 2 through 50, and also as to request number

21 53.

22         While the Plaintiffs may not agree with these denials,

23 Plaintiffs certainly have sufficient time to conduct further

24 discovery and question SCI regarding the basis for its answers

25 to these requests for admissions in possible depositions.  And

1  if that doesn't work out, certainly to cross-examine during the

2  trial.  So as to those denials once, again, SCI will live by

3  those answers.

4         The motion, however, is granted in part as to request

5  52, 55, and 56.  The Court is not convinced that Defendant SCI

6  has fulfilled its obligation to conduct a reasonable inquiry

7  regarding the previous advertisements that are listed in those

8  three requests for admissions.

9         So I am going to give the Defendants an additional

10  opportunity to amend after consulting with its web designer, or

11  IT person, regarding this issue.

12        In connection with the request for admissions, I do

13  want to put forth various principles that govern my ruling in

14  this regard.

15        Rule 36(a) allows litigants to serve on another

16  litigant a written request to admit the truth of any matters

17  within the scope of Rule 26(b)(1) that relates to facts, the

18  application of law, or fact or opinions, as well as the

19  genuineness of any described documents.

20        Here, these requests deal with facts.  Rule 36 request

21  for admissions are not meant to be a discovery device.

22  Instead, the rule is intended to weed out issues, which the

23  requesting party will doubtless be able to prove.

24        Rule 36(b) affords the responding party limited

25  options for answering a request for admissions.  If a matter is

1  not admitted, the answer must specifically deny it, or state in

2  detail why the answering party cannot truthfully admit or deny

3  it.

4        A denial must fairly respond to the substance of the

5  matter.  And when good faith requires that a party qualify an

6  answer, or deny only part of a matter, the answer must specify

7  the part that is admitted and qualify or deny the rest.

8        The answering party may also assert lack of knowledge

9  or information as a reason for failing to admit or deny, but

10  only if the party states that it has made a reasonable inquiry

11  and that the information it knows or can readily obtain is

12  sufficient for it to enable it to admit or deny.

13        And that is the basis on which Defendants' answers to

14  52, 55, and 56 were deficient.

15        If the Court finds that an answer does not comply with

16  the rule, the Court may order either that the matter be

17  admitted or that an amended answer be served.  And as I stated

18  before, I am ordering an amended answer be served after

19  conversation with the web designer or IT person.

20        In addition, a party may move to withdraw or amend

21  admissions made under Rule 36.  Additionally, subject to Rule

22  16(e) the Court may permit withdrawal or amendment if it would

23  promote the presentation of the action or if the Court is not

24  persuaded that it would prejudice a requesting party in

25  maintaining or defending the action on the merits.

1          For that reason Rule 36(b) sets forth two factors for

2   the Court to consider in deciding whether to permit a party to

3   withdraw or amend its the admissions.  The first fact that

4   emphasizes the importance of having the action resolved on the

5   matter.

6          The second factor requires the Court to examine, as I

7   said before, whether the party requesting the admission would

8   be prejudiced by the withdrawal or the amendment.

9          As the Eleventh Circuit has explained the prejudice

10  contemplated by the rule is not simply that the parties who

11  initially obtained the admission will now have to convince the

12  fact-finder of the truth, but rather it relates to the

13  difficulty that a party may face in proving its case such as

14  caused by the unavailability of a witness because of the sudden

15  need to obtain evidence with respect to questions previously

16  answered by the admission.

17         In this case, that leads me to our last motion, which

18  is Defendant SCI's motion for relief from Plaintiffs' claims of

19  technical admissions and that's at ECF number 88.  The

20  principles that I just alluded to dealing with the two factors

21  for allowing an amendment apply here in this case and they

22  apply and the result is in Defendants' favor.

23         I am going to deem the responses served on Plaintiffs

24  as of February 7th of 2022.  I was convinced by the

25  presentation that this was a clerical error that has not

1    resulted in any prejudice to Plaintiffs.

2           In fact, Plaintiffs conceded as such during our

3    hearing today.  What we have now are two pretty much

4    contradictory admissions which the Plaintiffs can certainly use

5    during cross-examination.

6           And this will allow the Court to satisfy the second

7    factor which is allowing the trier of fact to decide the issue

8    on the merits.  Both factors favor the Court's discretion in

9    allowing or deeming that these responses were served on

10   February 7th.

11          So those are the rulings on the actual motions.  There

12   are a couple of other matters to discuss and that is the issue

13   of the first request for admissions to KKM that was alluded to

14   in really a very short sentence in one of the filings.

15          I agree with Defense counsel that it is really not

16   presently or properly at issue.  It was not the subject

17   whatsoever of the Joint Status Report.  So I am not going to

18   consider that at this time.  Obviously the parties will file

19   appropriate motions if necessary.

20          Now, in terms of the joint protocol that the parties

21   will have seven days from today to develop that joint protocol.

22   I believe seven days from today is August 4th.  After that

23   testing is to be conducted within 14 days of that protocol and

24   that is August 11th.

25          In terms of the motions that I have granted and

1   require the production of additional documents, including just

2   the amendment if there are no other documents, that also will

3   be responsive documents or the amended answer will also be due

4   in 14 days.  That is August 11th.

5           And the reason for the short deadlines, obviously is

6   the fact that we have a discovery deadline of August 30th.  I

7   cannot change that deadline for you.  If you want an extension

8   of any kind, you need to request that extension from Judge

9   Smith.

10          And in passing, with reference to the discovery

11  deadline, I also note that there was a lot of discussion today

12  about depositions that had not been had, or scheduled.  Again,

13  I just remind you all that the discovery deadline is

14  August 30th, which is literally 30 days away.

15          The last for me to consider today is the request,

16  Plaintiffs' request in each of its motions for fees under Rule

17  37(a)(5).  And that rule provides for the payment and expenses,

18  including attorney's fees when a Court grants a motion to

19  compel, unless the objecting parties' position was

20  substantially justified.

21          Given the lengthy nature of our hearing today and the

22  mixed rulings that I have issued today with reference to

23  Defendants in clarifying its answers, I am going to find that

24  the Defendants' position was, in fact, substantially justified

25  and, therefore, Plaintiffs will bear its own costs and fees in

1  connection with the motion.

2         All right.  So I think, gentleman, that I have

3  addressed everything that was before me today.  I think we have

4  a lot of work to do in this case given the short discovery

5  deadlines.  So, remember, I cannot change those dates.  So I

6  wish you well.

7         Anything else from Plaintiffs?

8         MR. YEE:  The only final thing, Your Honor, is that

9  you did indicate that any extensions would have to go through

10  Judge Smith.

11         I just want to bring to the Court's attention the

12  ruling regarding the joint protocol, I think we can get the

13  protocol done, but the joint testing within 30 days might be

14  problematic.  Our expert is currently out of the country in New

15  Zealand and I don't believe he will be back by August --

16         THE COURT:  I mean, that is something that the parties

17  can work amongst themselves.  I want to impress upon you the

18  urgency and the reality of the discovery deadline that is

19  exists presently.  I can't go beyond it, but you can certainly

20  agree to something between yourselves.

21         MR. YEE:  Okay.  Thank you, Your Honor.

22         THE COURT:  Anything else from the Defense?

23         MR. BENFORD:  Your Honor, this is John Benford.  A

24  quick point of clarification.

25         As far as SCI's amended answers to Plaintiffs' second

1  request for admissions, 52, 55, and 56, what is the timeframe

2  in which that is due?  Is that 14 days?  Did I understand Your

3  Honor correctly?

4         THE COURT:  Yes.

5         MR. BENFORD:  Okay.  Thank you, Your Honor.

6         THE COURT:  Same deadline for everybody.

7         MR. BENFORD:  Okay.  Thank you.

8         THE COURT:  And again, the parties can work, despite

9  your differences, I think you have worked well together.

10        And I think to the extent that you need more time and

11 you can work it out amongst yourselves without further Court

12 intervention obviously that is encouraged.  But if you can't do

13 it and you can't agree, obviously let me know.

14        MR. BENFORD:  Sure.  Thank you.

15        MR. YEE:  Thank you, Your Honor.

16        THE COURT:  I want to thank everyone for the lengthy

17 for participating in this very lengthy 20-minute hearing.

18        I should say 40-minute hearing and I do appreciate the

19 fact that both parties were very professional and very

20 prepared.  That always makes my job easier even when I am

21 putting together a jigsaw puzzle.

22        So thank you very much for that.

23        MR. FIATO:  I would like to thank you for your time

24 this afternoon, Your Honor.

25        THE COURT:  All right.  Thank you everyone.

1          That concludes the hearing and I am going to stop the

2   recording and you all are free to leave.

3          MR. MARI:  Thank you, Your Honor.  Have a good day.

4          THE COURT:  Thank you.  You too.

5          (Thereupon, the proceedings concluded.)

1

2                         CERTIFICATE

3

4         I hereby certify that the foregoing transcript is an

5    accurate transcript of the proceedings in the above-entitled

6    matter.

7

8

9

10
     10/12/22                     Bonnie Joy Lewis
11                        Registered Professional Reporter
                             CASE LAW REPORTING, INC.
12                          7001 Southwest 13 Street,
                           Pembroke Pines, Florida 33023
13                              954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25