**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-CV-61469-RS**

AKAI CUSTOM GUNS, LLC,
a Florida Limited Liability Company,
and SHAY HOROWITZ, an individual,

       Plaintiffs,

v.

KKM PRECISION, INC., a Nevada Corporation,
and SHOOTERS CONNECTION, INC., a
Kentucky Corporation,

       Defendants.

_____/

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

    This matter is before the Court on the parties' cross-motions for Summary Judgment:
Plaintiffs' Motion for Partial Summary Judgment [DE 109] ("Plaintiffs' Motion"), Defendants'
Opposition [DE 118], and Plaintiffs' Reply [DE 126]; and Defendants' Joint Motion for Summary
Judgment [DE 112] ("Defendants' Motion"), Plaintiffs' Opposition [DE 117], and Defendants'
Reply [DE 124].

    The parties' dispute involves claims for misleading advertising, unfair and deceptive trade
practices, breach of warranty, defamation, and commercial disparagement resulting from the
allegedly misleading advertisement and sale of what Plaintiffs claim to be defective pistol barrels
manufactured, sold, and distributed by Defendants.  For the reasons that follow, Defendants'
Motion is granted in part, and Plaintiffs' Motion is denied.

## I.   MATERIAL FACTS

Plaintiff, Akai Custom Guns, LLC ("Akai"), manufactures custom 1911 and 2011 based pistols used primarily for shooting competitions in the United States.[1]  Akai was formed in or around 2010 by Plaintiff Shay Horowitz, who acts as its sole member, owner, and manager. Defendant KKM Precision, Inc. ("KKM") manufactures firearm barrels, which it then sells to gun builders and private citizens through its website.  KKM manufactures barrels that may be utilized in 1911 and 2011 pistols.  Luke McIntire serves as the CEO of KKM.  Defendant Shooters Connection, Inc. ("SCI") is a retailer of parts and products used to manufacture and repair firearms. KKM is one of the manufacturers from which SCI purchases parts to sell to the general public through its website.

To manufacture its custom 1911 and 2011 pistols, Akai purchases pistol barrels made from Type 416R steel quality with a minimum Rockwell hardness of 42 RC from barrel manufacturers and distributors.  The Rockwell scale is a hardness scale based on indentation hardness of a material (in this case, stainless steel).  A higher Rockwell hardness number denotes a harder material.  Type 416 stainless steel is known as a "free machining"[2] variant of Type 410 stainless steel, with a relatively high sulfur content between 0.15 and 0.35 weight percentage.  (Pls.' Expert Report at 3 [DE 79-1].)  In contrast, Type 416R stainless steel has a more controlled chemistry, particularly its lower sulfur levels with a specification of 0.13 weight percentage (+/-0.01).  (*Id.*; *see also* Crucible Data Sheet [DE 90-1] (same specifications for Type 416R steel).)  Some industry experts, however, claim that there is no single, unitary type of specification for Type 416R stainless steel – these reports identify a sulfur content between 0.15 and 0.375 weight percentage for Type

---

[1] The Court omits citations to the record where a fact is undisputed.

[2] The high sulfur content of this type of stainless steel results in the formation of extensive manganese sulfide inclusions which facilitates chip formation during machining, resulting in easier, or "free," machining. (Pls.' Expert Report at 3 [DE 79-1].)

416R stainless steel.  (Defs.' Expert Report at 3 [DE 93]; *see also* McIntire Dep. [DE 113-3] at 155:2-156:14 (same specifications).)  A third type of 416 stainless steel, known in the industry as 416 BQ#5, is a balanced version of standard 416 stainless steel with a sulfur content of 0.15 weight percentage.  (Pls.' Expert Report at 3.)

KKM's website states that KKM only manufactures barrels using Type 416R gun-barrel quality steel and that all its barrels have a minimum Rockwell hardness of 42; indeed, products manufactured by KKM have the following description on the company website:

> All KKM barrels are made using certified 416R gun-barrel quality stainless steel bar stock. Our barrels are then heat treated and vacuum tempered to 42 RC. All of our barrels are CNC machined to obtain superior dimensional tolerances over stock. Our advanced proprietary button rifling process allows KKM barrels to offer greater accuracy over stock barrels. Our barrels come with fully supported match chambers for shooting factory or reloaded ammunition as well as lead or jacketed bullets.

(Pls.' Opposition Ex. A [DE 117-1] at 1-2.)

SCI advertises KKM barrels for sale on its website but in the past has omitted details from the SCI website regarding the type of steel from which the KKM barrels are created and the Rockwell hardness of the KKM barrels that it sells to the public.  SCI had no personal knowledge of the steel composition of the KKM barrels for sale on the SCI website until in or around December 2019, two months after Akai first purchased items from the SCI website.[3]  (Bradley Dep. [DE 113-5] at 131:19-137:21.)  Furthermore, SCI's website states that all product warranty issues for products sold on the SCI website are handled by the product manufacturer.  (Ex. 14 to Horowitz Dep. [DE 113-1]; *see also* Bradley Dep. at 99:23-100:19; 131:9-18.)

Since its inception in or around 2010, Akai has purchased 188 KKM barrels – 58 barrels directly from KKM and 115 barrels directly from SCI – for use in building its custom 1911 and

---

[3] An SCI employee first learned of the steel composition of the KKM barrels for sale on the SCI website through a conversation with McIntire in December 2019.  (Vlieger Dep. [DE 109-7] at 142:16-144:14 and 228:10-230:7.)

2011 pistols.  Akai decided to purchase KKM barrels following conversations between Horowitz and McIntire in which McIntire advised that KKM used 416R steel to make KKM barrels, and that these barrels would be fit for use in Akai's pistols.  (Horowitz Decl. [DE 109-2] ¶¶ 4-5.)  Akai also relied on KKM's website for barrel descriptions prior to placing purchase orders; it did not similarly rely on the SCI website, in part because SCI's website did not contain the same product descriptions regarding steel quality and Rockwell hardness.  (Horowitz Dep. at 89:22-93:3.)

Beginning in 2019, several of Akai's customers began returning their custom pistols, reporting that the pistols were malfunctioning.  (Horowitz Dep. at 110:21-112:5.)  After an investigation, Akai discovered that all of the malfunctioning pistols were built using KKM barrels. (*Id.* at 116:13-117:12.)  Akai discovered that KKM barrels showed signs of failure, such as compacted surfaces, folded metal, or compacted metal on the hood and lugs, or any of the lock up surfaces.  (*Id.* at 117:13-120:25.)  In some instances, the KKM barrels were soft, flexible, and changing shape and dimensions, which caused the pistols to malfunction.  (*Id.* at 122:20-123:14.) Even after investigation and attempted repair, Akai observed that the KKM barrels continued to come out of specification.  (*Id.* at 124:11-127:4.)

Akai sent some KKM barrels to QC Metallurgical, Inc., a metallurgical and forensic engineering laboratory, for independent testing.  (*Id.* at 129:4-14.)  After testing the KKM barrels, the results indicated that many KKM barrels had a Rockwell hardness below the advertised 42 RC. (*Id.* at 132:12-133:12.)  Additionally, following a chemical composition analysis, Akai discovered that the KKM barrels were composed of steel with sulfur content at or around 0.321 weight percentage, suggesting that the barrels were made from Type 416, not Type 416R, stainless steel. (Certificate of Test [DE 90-7]; *see also* Marcanio Decl. [DE 100-3].)  Akai raised these issues with KKM.  KKM responded that there is no single, unitary type of specification for Type 416R stainless steel, and that the "R" in KKM Type 416R stainless steel means "restricted," in that the

4

composition of the stainless steel is restricted to certain elements and certain tolerances within those elements.  (McIntire Dep. at 27:6-28:2, 155:2-157:21, 229:6-9.)  Moreover, KKM indicated that other industry manufacturers also utilize Type 416R (restricted) stainless steel with a similar chemical composition as the barrels sold to Akai.  (*Id.* at 214:21-216:5.)

On September 19, 2019, Akai again contacted KKM and SCI to report the issues observed with respect to the KKM barrels.  (*Id.* at 132:1-133:17.)  Horowitz told Charles Bradley, CEO of SCI, and Luke McIntire, CEO of KKM, that the KKM barrels were failing and defective.  (*Id.*)  McIntire stated that KKM had never had a barrel test below specification and requested that Horowitz send KKM the purportedly soft barrels so KKM could conduct independent testing.  Plaintiffs declined, refusing to return any of the allegedly defective barrels to KKM.  McIntire informed Horowitz that, since there is no standard way of testing a barrel, Akai should not expect a full refund on its purchase because KKM was not "in the business of giving out free barrels."  (*Id.* at 138:12-139:7.)  Based on McIntire's statements, Horowitz elected to retain all KKM barrels in Akai's possession, rather than return them to KKM, because Horowitz feared that KKM would not preserve the allegedly defective barrels.  (*Id.* at 135:13-136:9.)  However, KKM never told Plaintiffs that it would retain, discard, or destroy any allegedly defective barrels sent by Plaintiffs to KKM for independent testing.  The relationship between KKM and Akai (and their principals) eventually deteriorated beyond repair, with the parties ceasing communication in October 2019.

On October 22, 2019, Akai announced a voluntary recall to repair and replace Akai pistols that were made with soft barrels from an unnamed manufacturer.  (*Id.* at 195:2-23.)  The soft barrels referenced in Akai's voluntary recall referred to barrels manufactured by KKM.  Subsequently, KKM began receiving multiple calls from customers and distributors regarding Akai's voluntary recall and the claims therein, which ultimately disrupted KKM's business operations and caused KKM to lose revenue.

On December 5, 2019, Akai sent a demand letter to KKM for disclosure of insurance information and for payment of $1,000,000.00 to resolve its claims against KKM.  KKM denied the requests in Akai's demand letter.  On January 9, 2020, McIntire drafted an "Open Letter" in response to Akai's voluntary recall and the corresponding business disruption experienced by KKM.  (*See* Open Letter, Ex. 8 to Pls.' Am. Compl. [DE 1-1] at 527.)  KKM does not maintain any social media accounts; thus, the Open Letter was published on SCI's Facebook page.  The Open Letter begins by stating:

> Over the past several weeks it has come to my attention, by concerned customers, that rumors within social media are claiming KKM Precision has produced "Soft" barrels and is being sued by a company who received these barrels. The truth is KKM Precision and one of our dealers have received a letter of intent to sue if KKM Precision doesn't pay $1 Million dollars in the next 30 days to said company. Prior to a Facebook post in October of 2019 by this company claiming "Soft" barrels, KKM Precision was not made aware of any issues with our heat treating and manufacturing process. Only that they had an issue with one barrel that they would like to send in for inspection. To date, this company has yet to send KKM Precision any proof of an "Out of Spec Soft Barrel" nor has any barrel ever been returned to us for inspection or warranty. *I do not know if this company really does intend to sue or if this was just a threat to cover up and lay blame on us for their own actions.*

(*Id.* (emphasis added).)  The last sentence in this excerpt from the Open Letter is the sole basis for Plaintiffs' defamation claims against KKM as alleged by Plaintiffs in their Amended Complaint.  The Open Letter goes on to state: "at KKM Precision our manufacturing process has been established from well over 25 years of producing pistol barrels for nearly every single firearm company . . . we use the very best stainless steel a Type 416R BQ#5 produced here in the United States."  (*Id.*)

In addition to the Open Letter, SCI published or caused to be published the following statements on its Facebook page: (1) that Plaintiffs' gun-barrel work is outside the normal specifications for 1911 gun barrel design (Ex. 3-12 to Pls.' Am. Compl. [DE 1-1 at 484]); (2) that Plaintiffs, in threatening to bring a lawsuit against Defendants, were perpetrating a public opinion

fraud (Ex. 3-6 to Pls.' Am. Compl. [DE 1-1 at 478]); (3) that Plaintiffs, in threatening to bring a lawsuit against Defendants, were perpetrating a scam (Ex. 3-9 to Pls.' Am. Compl. [DE 1-1 at 481]); (4) that Plaintiffs misled customers regarding KKM barrel malfunctions (Ex. 3-14 to Pls.' Am. Compl. [DE 1-1 at 486-87]); (5) that Plaintiffs' gun-barrel heat treaters were uncertified (*id.*); (6) that Plaintiffs' gun-barrel testing methods and mechanisms were faulty (Ex. 3-10 to Pls.' Am. Compl. [DE 1-1 at 482]); and (7) that others may want to look into Plaintiff Shay Horowitz's history (Ex. 3-9 to Pls.' Am. Compl. [DE 1-1 at 481]).  These publications were viewed by individuals in the competitive shooting industry, and they resulted in hundreds of follow-up statements in the "comments" section of the original Facebook postings.  (Sheres Decl. [DE 49-3].)  Horowitz testified that these publications resulted in a seventy-five percent decrease in Akai's sales.  (Horowitz Dep. at 239:23-240:18; *see also* Akai 2017-2021 Profit & Loss Statements, Ex. 13 to Pls.' Mot. [DE 109-13].)

Based on these factual allegations, Plaintiff's Amended Complaint [DE 1-1 at 111-534] brings twenty-nine counts against Defendants.  At bar are the following eighteen counts[4] that have survived Defendants' Joint Motion to Dismiss: misleading advertising against KKM (Count I); misleading advertising against SCI (Count II); violation of the Florida Deceptive and Unfair Trades Practices Act against KKM and SCI (Count III); fraudulent inducement against KKM and SCI (Count IV); breach of express warranties against KKM and SCI (Count VI); breach of implied warrant of merchantability against KKM and SCI (Count VII); breach of implied warranty of fitness for a particular purpose against KKM and SCI (Count VIII); revocation of acceptance against KKM and SCI (Count IX); defamation against KKM (Count X); defamation *per se* against KKM (Count XI); defamation by implication against KKM (Count XII); defamation against SCI

---

[4] The Court will refer to Plaintiffs' counts in the manner and number as they appear in Plaintiffs' Amended Complaint.

(Count XIII); defamation *per se* against SCI (Count XIV); defamation by implication against SCI (Count XV); commercial disparagement against KKM (Count XXII); commercial disparagement against SCI (Count XXIII); civil conspiracy to commit commercial disparagement against KKM (Count XXVI); and civil conspiracy to commit commercial disparagement against SCI (Count XXVII).

## II.   SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, "summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[G]enuine disputes of facts are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (internal marks omitted). A fact is material if, under the applicable substantive law, it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the initial responsibility of supporting its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Catrett*, 477 U.S. at 323. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (internal marks omitted).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Catrett*, 477 U.S. at 324. A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## III.   DISCUSSION

Plaintiffs' claims can be grouped generally into four categories: (1) misleading advertising claims (Counts I-IV); (2) breach of warranty claims (Counts VI-IX); (3) defamation claims (Counts X-XV); and (4) commercial disparagement claims (Counts XXII, XXIII, XXVI, XXVII). Defendants move for summary judgment on each of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 56. Plaintiffs also move for summary judgment pursuant to Rule 56 on the claims in categories (1), (3), and (4) referenced above. The Court will address these claims in turn.

### A.   Misleading Advertising Claims (Counts I, II, III, IV)

#### i.   Violations of Florida Statute, Section 817.41

Florida law prohibits any person from making or disseminating or causing to be made or disseminated before the general public of the state of Florida any misleading advertisement. Fla. Stat. § 817.41(1). A "misleading advertisement" is defined by statute as:

> [A]ny statements made, or disseminated, in oral, written, electronic, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services.

Fla. Stat. § 817.40(5).  To establish a claim for misleading advertising under Florida law, a plaintiff must prove that: (1) the representor made a misrepresentation of a material fact; (2) the representor knew or should have known of the falsity of the statement; (3) the representor intended that the representation would induce another to rely and act on it; and (4) the plaintiff suffered injury in justifiable reliance on the representation.  *Vance v. Indian Hammock Hunt & Riding Club*, 403 So. 2d 1367, 1370-72 (Fla. 4th DCA 1981); *see Joseph v. Liberty Nat'l Bank*, 873 So. 2d 384, 388 (Fla. 5th DCA 2004) ("the adoption of section 817.41(1) requires one seeking to maintain a civil action for violation of the statute to prove each of the elements of common law fraud in the inducement, including reliance and detriment, in order to recover damages.").

### a.      Misleading Advertising Against KKM

Plaintiffs move for summary judgment on Count I against KKM and Count II against SCI on grounds that both entities knowingly made a misrepresentation of fact with respect to the steel composition and hardness of the gun barrels at issue in order to induce Plaintiffs' reliance and ultimate purchase of the products.  Defendants counter that they never engaged in misleading advertising, as defined by statute, and that, in any event, summary judgment must be denied because of the existence of genuine issues of material fact regarding the composition and hardness of the gun barrels at issue.

Summary judgment on Count I is denied due to genuine issues of material fact necessary to resolve the misleading advertising claim with respect to Defendant KKM.  Although it is undisputed that Plaintiffs purchased gun barrels from KKM, a genuine and material dispute exists over the composition and hardness of the gun barrels.  Plaintiffs argue that KKM committed misleading advertising in stating that all KKM gun barrels in question are made using certified Grade 416R quality stainless steel bar stock with a Rockwell hardness of 42RC.  Plaintiffs provide evidence showing that Grade 416R steel has a sulfur content of 0.13 +/-0.01 weight percentage,

while Grade 416 steel has a sulfur content between 0.15 and 0.35 weight percentage.  Plaintiffs have demonstrated that the KKM barrels they purchased did not meet these specifications for Grade 416R steel following independent testing showing sulfur content outside of the range for Grade 416R steel quality.  Plaintiffs argue that KKM therefore engaged in misleading advertising on the KKM website by marketing and selling barrels as made from Grade 416R steel where the barrels were not made of Grade 416R steel.  On the other hand, Defendants contest Plaintiffs' specifications with respect to Grade 416R steel and argue that Grade 416R steel in fact denotes "Grade 416 Restricted" steel, which is a type of Grade 416 steel that has had certain chemical properties restricted during the manufacturing process.  Defendants present evidence demonstrating that there are multiple variations of Grade 416 steel generally identified as Grade 416R in the industry, where the "R" stands for "Restricted."  Indeed, Defendants' expert reports that there is no one type of Grade 416R steel quality, and KKM's CEO has similarly testified. Thus, there is a genuine dispute of material fact as to the composition of Grade 416R steel, whether there is one industry standard for Grade 416R steel, and whether the KKM barrels sold to Plaintiffs are made of Grade 416R steel.  These are questions of fact for the jury which must be resolved to determine whether KKM made misleading advertisements.  Summary judgment on Count I must therefore be denied.

### b.    Misleading Advertising Against SCI

The analysis changes with respect to Plaintiffs' Count II for misleading advertising against Defendant SCI.  Plaintiffs have not proven that SCI made a misrepresentation or false statement in connection with an advertisement that was intended to induce Plaintiffs' reliance and ultimate purchase of gun barrels from the SCI website; thus, summary judgment is entered for Defendant SCI on Count II.  The Court finds three reasons why summary judgment for Defendant SCI on Count II is appropriate: first, there is no evidence that SCI made a misrepresentation or false

statement with respect to the KKM gun barrels for sale on the SCI website; second, SCI could not, and did not, know of the falsity of any alleged representation pertaining to KKM gun barrels on its website; and third, any alleged representation on the SCI website was not intended to induce Plaintiffs' purchase.

As to the first reason, the parties agree that SCI's website makes no reference to the type of steel used to make KKM barrels. Plaintiffs thus premise their theory of liability for misleading advertising in Count II on a misrepresentation by omission. However, the statute specifically references "any statement" in defining and proscribing misleading advertising – there is no reference to a misrepresentation or false advertisement by omission. *Compare* Fla. Stat. § 817.40(5) ("The phrase 'misleading advertising' includes any statements made, or disseminated, in oral, written electronic or printed form . . . "), *with* Fla Stat. § 634.436(1) (defining false advertising of insurance policies as "knowingly making . . . any estimate, illustration, circular, statement, sales presentation, [or] omission . . . "). If the Florida Legislature had intended that liability for false advertising under section 817.41 encompass misrepresentations by omission, it could have so stated, as it has done in the context of false advertising in the insurance industry. But it did not, and Plaintiffs have not cited any case law for the proposition that false advertising encompasses misrepresentations by omission under the applicable Florida statute.[5] Thus, any omission on SCI's website relating to KKM barrels does not rise to the level of a misrepresentation of a material fact for purposes of a misleading advertising claim.

---

[5] Plaintiffs note in their briefing that this Court had previously disagreed with Defendants' arguments regarding misleading advertising by omission. It is true that the Court, in its Order Granting in Part Joint Motion to Dismiss [DE 56], allowed Plaintiffs' Count II to survive a challenge under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. However, in that context, the Court must accept all allegations as true and evaluate all plausible inferences derived from those allegations in favor of the plaintiff. *See United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1066 (11th Cir. 2007). That standard differs greatly from the standard at issue here, where the movant must prove that it is entitled to judgment as a matter of law. *Catrett*, 477 U.S. at 322. Although Plaintiffs adequately pled a claim for relief in Count II, they have not proven it as a matter of law.

The final two grounds for granting summary judgment to SCI on Count II flow from the first: SCI could not, and did not, know of the falsity of any statement pertaining to KKM gun barrels on its website because it did not disseminate any affirmative statements on its website regarding the composition of KKM barrels. Furthermore, SCI's representation (or, in this case, lack thereof) did not induce Plaintiffs' reliance. Indeed, the record shows that SCI had no knowledge of the composition of the KKM gun barrels until around December 2019, two months after Plaintiffs made their first purchase from the SCI website. Thus, SCI could not have intended that its omission induce Plaintiffs to purchase KKM barrels from its website where SCI itself did not have knowledge of the composition of the KKM barrels, and where Plaintiffs had already determined to purchase KKM barrels. For these three reasons, the Court enters summary judgment on Count II for SCI.

### ii.    Florida Deceptive and Unfair Trade Practices Act

Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.204(1). To establish a FDUTPA claim, a plaintiff must prove: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Carriuolo v. GM Co.*, 823 F.3d 977, 983 (11th Cir. 2016); *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008). Under FDUTPA, deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment. *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). This standard requires a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer. *Millennium Commc'ns & Fulfillment, Inc. v. Office of the Att'y Gen.*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000).

Plaintiffs move for summary judgment in Count III against both Defendants, arguing that there can be no genuine dispute that Defendants violated FDUTPA if they are held to have committed misleading advertising.  Defendants move for summary judgment on Count III as to Defendant SCI only, arguing that SCI has not violated the statute, particularly if this Court were to find that it did not commit misleading advertising.

Summary judgment is entered on Count III for Defendant SCI only.  Upon review of the evidence, the Court finds that SCI has not engaged in deceptive or unfair trade practices as a matter of law with respect to the marketing and sale of the KKM barrels on the SCI website.  The SCI website does not reference the steel quality or hardness of the KKM barrels for sale.  This omission does not rise to the level of "probable, not possible, deception" likely to cause injury to a reasonable relying consumer.  *See Millennium Commc'ns & Fulfillment, Inc.*, 761 So. 2d at 1263.  Furthermore, Plaintiffs have not established that any omission on the SCI website directly caused them to purchase the KKM barrels and incur actual damages.  *See Hennegan Co. v. Arriola*, 855 F. Supp. 2d 1354, 1361 (S.D. Fla. 2012) (finding that causation under FDUTPA "must be direct rather than remote or speculative").  In fact, Plaintiff Horowitz testified that what caused Plaintiffs to purchase the KKM barrels from the SCI website were representations made by KKM, not SCI.  Because the Court has held that SCI did not commit misleading advertising, that claim cannot be the basis for liability on Plaintiffs' FDUTPA claim.  Because the Court has found that any omission on the SCI website regarding the KKM barrels at issue was not probable deception, and because there is no direct causation linking any omission to Plaintiffs' actual damages, summary judgment will be entered for SCI on Count III.

Plaintiffs' motion for summary judgment on Count III as to Defendant KKM is denied.  Plaintiffs premise their FDUTPA claim against KKM on the same allegations supporting their misleading advertising claim in Count I.  The Court has denied summary judgment on Count I due

to the presence of genuine issues of material fact necessary to resolve that claim.  Similarly, summary judgment on Count III as to Defendant KKM will be denied because whether KKM engaged in misleading advertising involves disputed questions of fact that would necessarily impact the determination of KKM's liability in Count III.  Thus, Plaintiffs' FDUTPA claim in Count III will survive against Defendant KKM.

### iii.    Fraudulent Inducement

Defendants move for summary judgment on Plaintiffs' Count IV for fraudulent inducement as to Defendant SCI only, arguing that SCI did not make any misrepresentations intended to induce Plaintiffs' reliance and that caused Plaintiffs' harm.  Plaintiffs counter that the omission on SCI's website regarding the quality and hardness of KKM barrels was a fraudulent misrepresentation that induced Plaintiffs' reliance and ultimate purchase, and that it caused Plaintiffs' harm.

To prevail on a claim for fraudulent inducement under Florida law, a plaintiff must prove that (1) the representor made a misrepresentation concerning a material fact; (2) the representor knew or should have known of the falsity of the statement; (3) the representor intended that the representation would induce another to rely and act on it; and (4) the plaintiff suffered injury in justifiable reliance on the representation.  *Biscayne Inv. Grp., Ltd. v. Guar. Mgmt. Servs.*, 903 So. 2d 251, 255 (Fla. 3d DCA 2005); *Azar v. Nat'l City Bank*, 382 Fed. App'x 880, 884 (11th Cir. 2010).

Summary judgment is granted on Count IV as to Defendant SCI only.  Defendants have proven that SCI did not disseminate a misrepresentation on its website concerning the KKM barrels intended to induce Plaintiffs' reliance and ultimate purchase of the barrels.  The record shows that SCI had no knowledge of the composition of the KKM barrels until around December 2019, two months after Plaintiffs made their first purchase from the SCI website.  Thus, SCI did not know that any alleged misrepresentation by omission was false at the time of Plaintiffs'

purchase.  Moreover, any misrepresentation in that instance would not have induced Plaintiffs'

justifiable reliance, particularly where Plaintiffs had already determined to purchase KKM barrels

(and had in fact purchased KKM barrels from the KKM website).  Because Defendants have

proven as a matter of law that SCI did not commit fraudulent inducement, summary judgment on

Count IV will be entered in favor of Defendant SCI.

### B.      Breach of Warranty Claims (Counts VI, VII, VIII, IX)

Defendants move for summary judgment as to Plaintiffs' breach of warranty claims in

Counts VI-IX.  Plaintiffs claim that Defendants breached various express and implied warranties

in selling them allegedly defective gun barrels.  Defendants counter that any implied warranties

were excluded from the bargain, and that Plaintiffs waived their rights under any express warranty

by refusing to return the allegedly defective goods upon Defendants' request.

Plaintiffs' warranty claims are governed by Article 2 of the Uniform Commercial Code

("UCC"), as adopted by Florida Statute, Section 672.101, *et seq.*  An express warranty is a promise,

assurance, or statement made by the warrantor regarding the condition, quality, or nature of a good

or property intentionally and clearly stated to the other contracting party.  Fla. Stat. § 672.313.  An

implied warranty of merchantability is an implied warranty that the goods for sale are

merchantable, or fit for the ordinary purposes for which they are originally intended to be used,

where the seller is a merchant who regularly deals with the goods in question.  Fla. Stat. § 672.314.

An implied warranty of fitness arises where the seller, at the time of contracting, has reason to

know that the buyer requires the goods for a particular purpose and that the buyer is relying on the

seller's skill or judgment to select suitable goods.  Fla. Stat. § 672.315.  "All implied warranties

are excluded by expressions like 'as is' or 'with all faults' or other language which in common

understanding calls the buyer's attention to the exclusion of warranties and makes plain that there

is no implied warranty."  Fla. Stat. § 672.316(3).

### i.        Implied Warranty Claims Against SCI

Plaintiffs allege breach of the implied warranty of merchantability against SCI (Count VII) and breach of the implied warranty of fitness for a particular purpose against SCI (Count VIII). Defendants argue that SCI excluded any implied warranties from the bargain and thus move for summary judgment on both counts.   Plaintiffs argue that any purported exclusion did not specifically mention the implied warranty and that, in any event, the exclusion was inconspicuous and thus insufficient to eliminate application of the warranty.

Summary judgment is denied as to Count VII and Count VIII because whether SCI's terms and conditions entail or represent "language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty" is a disputed question of fact left for a jury to decide.  Fla. Stat. § 672.316(3).

### ii.        Express Warranty Claim Against SCI

Plaintiffs allege breach of express warranty against SCI in Count VI.  However, there is simply no express warranty provided by SCI upon which Plaintiffs may rely to support their claim. Plaintiffs cite Florida Statute, Section 672.313 for the proposition that express warranties may be created through a description of the goods that ultimately become a basis of the bargain.  Plaintiffs argue that a description of the barrels at issue on SCI's website were made part of the basis of the bargain and therefore created an express warranty that the barrels would conform to that description.  However, the record shows that Plaintiffs were originally induced to purchase KKM barrels not from the product description on the SCI website but rather through representations made by KKM's CEO to Plaintiffs.  Furthermore, the parties do not dispute that the SCI website in the past has omitted details regarding the steel quality and Rockwell hardness of the KKM barrels for sale on the SCI website; the record is unclear as to when SCI began including detailed product descriptions of the KKM barrels listed for sale on its website.  Thus, given these facts, it

was not the SCI product descriptions that became a basis of the bargain to create an express warranty; instead it was KKM's representations that induced Plaintiffs' purchases. Thus, the Court holds that the SCI product descriptions did not create an express warranty. Plaintiffs' claim for breach of express warranty against SCI in Count VI fails, and summary judgment is entered for SCI on Count VI.

### iii. Express Warranty Claim Against KKM

Plaintiffs allege breach of express warranty against KKM in Count VI. Defendants move for summary judgment, arguing that Plaintiffs waived the opportunity to claim a breach of express warranty when they refused to return the allegedly defective goods to KKM, the seller, upon KKM's request. Plaintiffs' argument revolves around the futility of any potential return as, according to Plaintiffs, Defendants rejected Plaintiffs' demand for replacement barrels following notification of nonconformity.

It is well-settled under UCC Article 2 and Florida warranty law that a vendor is entitled to a return of the goods sold in the context of a breach of warranty claim: the UCC provides that "either party on reasonable notification to the other and for the purpose of ascertaining the facts and preserving the evidence has the right to inspect, test and sample the goods including such of them as may be in the possession or control of the other." Fla. Stat. § 672.515(1). Additionally, Florida warranty law has long held that "when goods are discovered not to answer the order given for them, or to be unsound, the purchaser ought immediately to return them to the vendor, or give him notice to take them back, and thereby rescind the contract; or he will be presumed to acquiesce in the quality of the goods." *Am. Mfg. Co. v. A. H. McLeod & Co.*, 82 So. 802, 803 (Fla. 1919); *see also Gen. Matters v. Paramount Canning Co.*, 382 So. 2d 1262, 1264 (Fla. 2d DCA 1980) ("Section 672.515, Florida Statutes, which codifies the inspection rationale, provides that either party may inspect, test and sample the goods including those in the possession or control of the

other for the purpose of ascertaining the facts and preserving the evidence.") (internal marks omitted).

Under the UCC and Florida law, KKM was entitled to a return of the allegedly defective gun barrels held by Plaintiffs following notification of nonconformity.  Plaintiffs' refusal to return the products at issue given the alleged nonconformity constitutes an acceptance of those goods pursuant to the UCC.  *See* Fla. Stat. § 672.606(1)(a) (buyer accepts goods when buyer signifies to the seller that the buyer will "retain them in spite of their nonconformity").  The effect of Plaintiffs' acceptance of the goods precludes Plaintiffs from revoking acceptance due to any alleged breach based on that nonconformity.  *See* Fla. Stat. § 672.607(2) ("Acceptance of goods by buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it").  Plaintiffs cannot now revoke acceptance of the barrels because of a claimed nonconformity where they originally accepted and retained the goods despite that nonconformity.  Moreover, Plaintiffs cannot maintain a breach of warranty claim on the basis of nonconformity to a warranty, where Plaintiffs accepted and retained the goods notwithstanding their alleged nonconformity to a warranty.  *See* Fla. Stat. § 672.607(3) ("the buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy").  Plaintiffs' failure to notify Defendants of the alleged breach of warranty on the basis of nonconformity and their failure to return the allegedly nonconforming goods to Defendants, following instruction to do so, bars their warranty claim under the UCC.  Thus, KKM is entitled to summary judgment on Count VI.

### iv.    Implied Warranty Claims Against KKM

Similarly, Plaintiffs' implied warranty claims on the basis of nonconformity against KKM in Count VII and Count VIII fail as a matter of law due to Plaintiffs' acceptance of the goods notwithstanding their alleged nonconformity and their refusal to return the allegedly defective

products to KKM for inspection, testing, and preservation of evidence.  *See* Fla. Stat. § 672.515(1); *A.H. McLeod & Co*, 82 So. at 803 (affirming judgment for the defendant on an implied warranty claim where the plaintiff had failed to return the allegedly defective goods in question); *see also Paramount Canning Co.*, 382 So. 2d at 1264 ("Section 672.515, Florida Statutes, which codifies the inspection rationale, provides that either party may inspect, test and sample the goods including those in the possession or control of the other for the purpose of ascertaining the facts and preserving the evidence.") (internal marks omitted).

v.      <strong>Revocation of Acceptance Claim Against KKM and SCI</strong>

Plaintiffs' Count IX brings a claim for revocation of acceptance against KKM and SCI. Under the UCC, a buyer may revoke his acceptance of goods "whose nonconformity substantially impairs its value to him if he has accepted it on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured."  Fla. Stat. § 672.608(1)(a).  Defendants move for summary judgment on this count, arguing that they offered to cure any alleged product nonconformity, but Plaintiffs refused.  Plaintiffs contest the sincerity of any such offer by Defendants, arguing that Defendants refused to accept return of the products and refused to refund the purchase price.

The Court grants summary judgment for Defendants on Count IX because Plaintiffs have refused to return the goods at issue to Defendants for inspection, testing, and preservation of evidence.  Plaintiffs may not sue for revocation of acceptance where they have not in fact revoked their acceptance of the goods at issue.  It is undisputed that Plaintiffs never returned the barrels to KKM, that KKM never told Plaintiffs that it would destroy any returned barrels, and that KKM did not tell Plaintiffs that it would refuse to return to Plaintiffs any barrels sent to KKM for testing and inspection.  In such a scenario, it was improper for Plaintiffs to maintain possession of the barrels yet bring a lawsuit for revocation of acceptance.  Indeed, Plaintiffs were under an obligation

20

to follow the reasonable instructions of Defendants following their notice of revocation.  *See* Fla. Stat. § 672.603(1) ("a merchant buyer is under a duty after rejection of goods in her or his possession or control to follow any reasonable instructions received from the seller with respect to the goods"); *see also* Fla. Stat. § 672.608(3) ("A buyer who so revokes has the same rights and duties with regard to the goods involved as if she or he had rejected them.").  Plaintiffs' refusal to follow the Defendants' instructions with respect to the goods at issue and their failure to return the goods for inspection, testing and preservation of evidence precludes their claim for revocation of acceptance.[6]  *See* Fla. Stat. § 672.607(2) ("Acceptance of goods by buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it").

### C.      Defamation (Counts X, XI, XII, XIII, XIV, XV)

Plaintiffs bring six defamation claims against Defendants.  Both sides move for summary judgment on these claims: Defendants argue that there is no genuine dispute that Plaintiffs have not proven each element of each claim against Defendants, while Plaintiffs argue that there is no genuine dispute that Defendants defamed Plaintiffs through the Open Letter and a series of postings on social media.

Defamation is generally defined as "the unprivileged publication of false statements which naturally and proximately result in injury to another."  *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015) (internal citations omitted).  To prove defamation under Florida law, a plaintiff must establish the following elements: (1) publication; (2) falsity; (3) that the defendant acted with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages;

---

[6] The reasonableness of Defendants' instruction is not in question here because Defendants had a right by law to request the return of the goods for inspection, testing, and preservation of evidence, *see* Fla. Stat. § 672.515; thus, an instruction to Plaintiffs in accordance with that legal right is presumptively reasonable.

and (5) that the statement at issue was defamatory.  *Johnston v. Borders*, 36 F.4th 1254, 1275 (11th Cir. 2022); *Jews for Jesus v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (citing Restatement (Second) of Torts §§ 558B, 580A-580B).  Words are defamatory when they "tend to subject one to hatred, distrust, ridicule, contempt or disgrace, or tend to injure one in one's business or profession." *Seropian v. Forman*, 652 So. 2d 490, 495 (Fla. 4th DCA 1995) (citing *Adams v. News-Journal Corp.*, 84 So. 2d 549 (Fla. 1955)).  Where a statement is ambiguous or subject to multiple interpretations and one is defamatory, it is for the jury to decide whether the statement is in fact defamatory.  *Hallmark Builders, Inc. v. Gaylord Broad. Co.*, 733 F.2d 1461, 1463 (11th Cir. 1984).

Defamation *per se* does not require any additional explanation to prove the defamatory nature of the statement.  Florida law holds that certain statements are so harmful in nature that they are presumed defamatory as a matter of law.  *Montgomery v. Knox*, 3 So. 211, 217 (Fla. 1887).  In a defamation *per se* action, the injurious nature of the statement is apparent from the words in the statement itself and the court consequently takes notice of that fact.  *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953).  The plaintiff is therefore not required to allege general damages, because the harm is readily apparent.  *Id.*  A publication may be defamation *per se* when, considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt or disgrace; or (4) it charges conduct, characteristics, or a condition incompatible with the proper exercise of a lawful business, trade, profession or office which thereby tends to injure one in his trade or profession.  *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953).  By contrast, in a defamation action, the words used, given their natural and common meaning, may not be inherently injurious but rather may be harmful as a consequence of extrinsic facts, such as innuendo.  *Scobie v. Taylor*, No. 13-CV-60457, 2013 WL 3776270 (S.D. Fla. July 17, 2013) (internal citations omitted).  Therefore, in a defamation action (as opposed to a

22

defamation *per se* action), the plaintiff must plead actual economic damage. *Campbell*, 66 So. 2d at 497.

Defamation by implication is a category of defamation law that applies in circumstances where literally true statements are conveyed in such a way as to create false impressions. *Jews for Jesus*, 997 So. 2d at 1108. Defamation by implication arises not from what is stated but from what is implied when a defendant: (1) juxtaposes a series of facts so as to imply a defamatory connection between them; or (2) creates a defamatory implication by omitting facts. *Id.* at 1106-07.

Turning now to the case at bar, Plaintiffs bring one count each for defamation, defamation *per se*, and defamation by implication against each Defendant. Plaintiffs and Defendants both move for summary judgment on each of the six claims. The Court will address these claims in turn.

> ### i.   Defamation and Defamation *Per Se* Against KKM

Plaintiffs have identified the Open Letter as the source of their defamation claims against KKM in Counts X and XI.[7] The Open Letter, drafted and published by KKM, contains the following statement: "I do not know if this company really does intend to sue or if this was just a threat to cover up and lay blame on us for their own actions." Plaintiffs argue that this statement defamed them by its inclusion of false, defamatory, and disparaging comments designed to discredit Plaintiffs' gun-building competency. This statement is also the basis for Plaintiffs' defamation *per se* claim against KKM. Plaintiffs argue that there is no genuine dispute as to any material fact with respect to these two defamation claims against KKM, and that they are entitled

---

[7] Plaintiffs have also identified in their Motion papers, for the first time, four allegedly defamatory statements published by KKM. Plaintiffs attempt in their Motion papers to make these four statements bases for their defamation claims against KKM. However, Plaintiffs cannot attempt to raise new claims or plead new allegations on summary judgment. *See Chaney v. United States*, 658 F. App'x 984, 988 (11th Cir. 2016) (holding that "a plaintiff may not raise a new claim, and in effect amend his complaint, through argument in his brief opposing summary judgment."). The Court will therefore disregard the four statements in the context of its defamation analysis.

to judgment as a matter of law.  On the other hand, Defendants argue that KKM is entitled to judgment on the two claims because Plaintiffs have not proven every element of each claim against KKM as required by law.

The Court grants summary judgment for KKM on Plaintiffs' defamation (Count X) and defamation *per se* (Count XI) claims against KKM.  Plaintiffs have not proven that the statement in the Open Letter is false or that its substance is defamatory in nature.  Instead, Defendants have shown that the statement in question is not defamatory.

To establish their claim for defamation, Plaintiffs were required to prove that the statement in the Open Letter is false and defamatory, and that Defendants acted negligently in publishing it. *See Jews for Jesus*, 997 So. 2d at 1106.  To establish their claim for defamation *per se*, Plaintiffs were required to prove that the statement in the Open Letter charges Plaintiffs with committing an infamous crime or with having an infectious disease; that the statement tends to subject Plaintiffs to hatred, distrust, ridicule, contempt, or disgrace; or that the statement charges conduct or characteristics so incompatible with the proper exercise of Plaintiffs' business in a way that tends to injure Plaintiffs in their trade or profession. *Richard*, 62 So. 2d at 598.  But Plaintiffs have not proven either claim.  Plaintiffs cannot show that the statement in question from the Open Letter is in fact false and defamatory, particularly because the statement is speculative in nature.  The statement begins with the phrase "I do not know if," which suggests that the clause following it is not authoritative or fact-based.  Because the statement is not asserted for its truth or veracity, it is not capable of being proven false as required in a defamation action. *See Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 717 (11th Cir. 1985) ("[A] publication, to be actionable, must be false and consist of a statement of fact."); *see also Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) ("True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment.").  Moreover, the

statement is not defamatory because it does not tend to "subject one to hatred, distrust, ridicule, contempt or disgrace, or tend to injure one in one's business or profession." *Seropian*, 652 So. 2d at 495.  Rather, the statement expresses Defendants' opinion as to whether Plaintiffs intended to sue Defendants.  This speculative opinion cannot be the basis of a defamation action.  *Wells*, 879 F.3d at 1262.  As such, the statement in the Open Letter cannot be the basis for a defamation or defamation *per se* claim.  As discussed in more detail below, the statement may imply some wrongdoing on the part of Plaintiffs, but it does not, by its own force, defame Plaintiffs.  Because the statement cannot be the basis for a defamation or defamation *per se* action, the Court grants summary judgment for KKM on Counts X and XI.

### ii.      Defamation by Implication Against KKM

The Court denies summary judgment as to Count XII because whether the statement in question from KKM's Open Letter created a false impression rising to the level of defamation by implication is a fact-based inquiry left to the province of the jury.  Defamation by implication arises from what is implied when a defendant creates a defamatory implication by omitting facts. *Jews for Jesus*, 997 So. 2d at 1106.  Here, KKM's statement pondering whether "this is just a threat to cover up and lay blame on us" may be reasonably interpreted as creating a defamatory impression that Plaintiffs caused the gun barrels at issue to fail because of their own professional incompetence.  In addition, the statement could be interpreted as implying some form of wrongdoing on the part of Plaintiffs, via a "threat," a "cover up," or some other nefarious implication.  By omitting the context of the statement and the accompanying facts relevant to the parties' dispute, KKM's statement creates certain impressions in the mind of a reasonable interpreter.  These impressions may be both defamatory and false, and they may rise to the level of defamation by implication.  In any event, these potential interpretations create a genuine issue of material fact with respect to Count XII; as such, summary judgment as to Count XII is denied.

### iii.    Defamation Claims Against SCI

Plaintiffs claim in Counts XIII, XIV, and XV that a series of statements in several social media postings published by SCI defamed them and injured them in the conduct of their business and profession.  Along with the Open Letter, Plaintiffs point to seven statements published via social media that are allegedly defamatory: (1) that Plaintiffs' gun-barrel work is outside the normal specifications for 1911 gun barrel design; (2) that Plaintiffs, in threatening to bring a lawsuit against Defendants, were perpetrating a public opinion fraud; (3) that Plaintiffs, in threatening to bring a lawsuit against Defendants, were perpetrating a scam; (4) that Plaintiffs misled customers regarding KKM barrel malfunctions; (5) that Plaintiffs' gun-barrel heat treaters were uncertified; (6) that Plaintiffs' gun-barrel testing methods and mechanisms were faulty; and (7) that others may want to look into Plaintiff Shay Horowitz's history.  Plaintiffs argue that it is undisputed that these statements were defamatory, and that judgment should be entered as a matter of law.  Defendants counter that summary judgment should be entered for SCI because the statements are not defamatory and because Plaintiffs have not offered evidence that the statements caused them damages.

The Court grants summary judgment for Defendants on Counts XIII and XIV because Defendants have demonstrated that the statements at issue are not defamatory.  However, the Court will deny the cross-motions for summary judgment as to Count XV (defamation by implication against SCI) because there are genuine issues of material fact as to whether certain statements at issue rise to the level of defamation by implication.  The Court will address these statements separately.

### a.    Perpetrating a Scam or Public Opinion Fraud

Upon careful review of the record, the Court finds that certain statements published by SCI are not actionable as defamation, defamation *per se*, or defamation by implication.  The U.S.

Supreme Court and the Eleventh Circuit recognize that a defamation claim may not be actionable when the alleged defamatory statement is based on non-literal assertions of fact or rhetorical hyperbole that cannot be interpreted as stating actual facts about an individual. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Keller*, 778 F.2d at 717.

Here, the statements that Plaintiffs, in threatening a lawsuit against Defendants, were perpetrating a scam or a public opinion fraud cannot be the basis for Plaintiffs' defamation claims against SCI because these statements represent non-literal assertions of fact and rhetorical hyperbole. The Court notes that the words themselves ("scam" and "public opinion fraud") do not have precise meanings. While some connotations may imply criminal behavior, others do not. *Cf. Greenbelt Cooperative Pub. Ass'n v. Bresler*, 398 U.S. 6 (1970) (finding the term "blackmail" in a publication to be rhetorical hyperbole and therefore holding that the publication could not support a defamation action on that basis). Just as the Supreme Court found in *Bresler* that the term "blackmail" could not support a defamation action given the circumstances of that case because of the term's imprecise meaning and hyperbolic nature, here too the Court cannot find the terms "scam" or "public opinion fraud" capable of maintaining Plaintiffs' defamation claims. Indeed, the lack of precision makes the two assertions incapable of being proven true or false. *Keller*, 778 F.2d at 717 ("[A] publication, to be actionable, must be false and consist of a statement of fact."). Put differently, these statements cannot be the basis for liability in a defamation action because they cannot be provable as false. *See id.* Moreover, the statements are not readily capable of being proven false in part due to their non-literal nature. For example, where Defendants say that Plaintiffs are "perpetrating a scam," Plaintiffs are left to imagine how exactly they would prove this statement to be false. Would Plaintiffs need to prove that they are not perpetrating a scam? What, precisely, is the scam? Would Plaintiffs need to prove that Defendants believed that the threatened lawsuit was not a scam? Or that the threat of litigation was not false? These statements

represent instances of rhetorical hyperbole that cannot be proven as false and thus cannot be the basis for any of Plaintiffs' defamation claims against SCI.

### b.      Outside Normal Specifications

The statement that Plaintiffs' gun-barrel work is outside the normal specifications for 1911 gun barrel design, when read in context, is a statement of pure opinion.  "Opinions are protected from defamation actions by the First Amendment."  *Id.*  The statement published by SCI regarding Plaintiffs' gun-barrel design and specifications falls into this category of protected pure opinion, particularly read in the context in which it arises:

> Luke [McIntire] told me the tungsten sleeve was much larger than what Limcat has done for 20 years. I asked him if that extra weight on a thinner barrel would create undue stress on the barrel. He said yes. Then he pointed out the location of the feet cut where the slide stop rides. Its way behind where it should be. Not sure if this [is] a different geometry to accommodate a stroked gun or not. But it is outside the normal specs for 1911 design. Luke also mentioned some radial lugs basically gone. These things pointed out in the past makes [m]e think that this is why none of the current barrels were sent to Luke for evaluation and testing.

(Ex. 3-12 to Pls. Am. Compl.)   The publication describes the author's opinion regarding the hardness of the barrel and its cut, the location of the tungsten sleeve on the barrel, its relative weight and size, the appearance of the barrel's redial lugs, and the location of the feet cut where the slide-stop rides.  The publication proceeds to state the author's opinion that Plaintiffs' gun-barrel design "is outside the normal specs for 1911 design."  Given this context and the detailed accounting of 1911 gun-barrel specifications, the Court finds that the statement at issue is protected pure opinion.

The Eleventh Circuit's opinion in *Keller* is instructive:

> In determining whether an alleged libelous statement is pure opinion, the court must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication.  The court must consider the context in which the statement was published and accord weight to cautionary terms used by the person publishing the statement.

28

*Keller*, 778 F.2d at 717 (internal marks omitted).  The Court has considered the full context in which the allegedly defamatory statement arises, including the explanatory terms and details preceding the statement, in holding that the statement is protected pure opinion.  Instead of lobbing incendiary comments and emotive language regarding Plaintiffs' work, the publication takes time and care to describe the gun-barrel specifications, related work in the industry, and deviations from the work.   Based on this context, the publication proceeds to issue its opinion regarding specifications for 1911 pistol design and whether Plaintiffs work was within that framework.  This means that the publication is offering an opinion, not false statements intended to injure another.  The publication also notes that the author is "[n]ot sure if this [is] a different geometry to accommodate a stroked gun or not" before stating the allegedly defamatory statement "[b]ut it is outside the normal specs for 1911 design."  The preceding sentence is thus a cautionary phrase intended to limit the reach of the latter sentence.  This, too, would weigh in favor of classifying the statement at issue as protected pure opinion and not actionable as defamation.  Because the statement at issue is protected pure opinion, it cannot be actionable as defamation.

### c. Heat Treaters and Testing Methods

The statements regarding Plaintiffs' gun-barrel heat treaters and testing methods cannot support Plaintiffs' defamation or defamation *per se* claims against SCI, but whether the statements rise to the level of defamation by implication is a fact-based inquiry best left for a jury.  The Court finds that these statements are not *per se* defamation.  The statements cannot support a defamation *per se* action because: they do not charge Plaintiffs with committing an infamous crime or with having an infectious disease; they do not tend to subject Plaintiffs to hatred, distrust, ridicule, contempt, or disgrace; and they do not charge conduct or characteristics so incompatible with the proper exercise of Plaintiffs' business in a way that tends to injure Plaintiffs in their trade or profession.  *See Richard*, 62 So. 2d at 598 (finding defamation *per se* in four specific instances).

Moreover, Plaintiffs have not proven that those statements are false either, thereby curtailing their ability to maintain a defamation action based on those statements.  *See Keller*, 778 F.2d at 717 ("[A] publication, to be actionable, must be false and consist of a statement of fact.").

Instead, it is Defendants that have demonstrated that the statements are not defamation *per se* by showing that the statements do not charge Plaintiffs with committing an infamous crime or with having an infectious disease; they do not tend to subject Plaintiffs to hatred, distrust, ridicule, contempt, or disgrace; and they do not charge conduct or characteristics so incompatible with the proper exercise of Plaintiffs' business in a way that tends to injure Plaintiffs in their trade or profession.  *See Richard*, 62 So. 2d at 598.  Additionally, Defendants have demonstrated the statements do not rise to the level of defamation – the words at issue are not defamatory because they are not inherently harmful or harmful via ambiguity or innuendo, and the statements have not caused Plaintiffs actual economic damages.  *See Campbell*, 66 So. 2d at 497 (holding that in a defamation action, "injurious effect must be established by due allegation and proof.").  Thus, the statements that Plaintiffs' gun-barrel heat treaters were uncertified and that their testing methods and mechanisms were faulty will not support Plaintiffs' defamation claims against SCI in Counts XIII and XIV.

However, whether the statements rise to the level of defamation by implication, thereby creating a false impression in the minds of third-party observers or customers, is a fact-based inquiry best left to the province of the jury.  *See Jews for Jesus*, 997 So. 2d 1108 (finding that defamation by implication occurs where literally true statements are conveyed in such a way as to create false impressions).  Whether the statements about Plaintiffs' heat treaters, testing methods and mechanisms are literally true but juxtaposed in such a way as to imply a defamatory connection or create a defamatory implication are questions of fact that will be left to the jury to decide.  Thus, summary judgment on Count XV is denied.

### d.       Have You Looked into Shay's History?

The statement published by SCI pondering whether anyone had investigated Plaintiff Shay Horowitz's history cannot support Plaintiffs' defamation claims against SCI in Count XIII and Count IV.  As discussed above, a publication, to be actionable, must consist of an assertion of fact and must be false.  *See Keller*, 778 F.2d at 717 ("[A] publication, to be actionable, must be false and consist of a statement of fact.").  The statement "have you looked into Shay's history" is not an assertion of fact that can be proven false; instead, it is a mere suggestion that is not actionable as defamation.  This statement therefore cannot support a claim for defamation or defamation *per se*.

However, whether the publication asking if the reader generally has "looked into Shay's history" rises to the level of defamation by implication, thereby creating a false impression in the minds of third-party observers or customers, is a fact-based inquiry best left to the province of the jury.  *See Jews for Jesus*, 997 So. 2d 1108 (finding that defamation by implication occurs where literally true statements are conveyed in such a way as to create false impressions).  This inquiry necessarily turns on questions of fact regarding Plaintiff Shay Horowitz's history and the impression the statement may create in the minds of third-party readers.  Thus, Plaintiffs may maintain this statement as a basis for their defamation by implication action against SCI in Count XV.

### e.       Plaintiffs Misled Customers About KKM Barrel Issues

The statement made to a third-party customer published by SCI states "I understand why you thought it was the barrel. You were misled by Shay [Horowitz] that it was the barrel."  The Court finds that this statement does not tend to injure Plaintiffs in the lawful exercise of their business because there is no evidence that any accusation of misleading behavior directly impacted Plaintiffs' business or future earnings potential.  Moreover, Plaintiffs have not proven that the

statement is false.  Thus, this statement cannot be the basis for a defamation action.  *See Keller*, 778 F.2d at 717.  Similarly, because the words are not inherently injurious or so harmful in nature as to be presumed defamatory as a matter of law, the statement also cannot be the basis for a defamation *per se* action.  *See Knox*, 3 So. at 217.

However, the statement may rise to the level of defamation by implication in that a jury could determine that the statement creates a defamatory implication by omitting certain facts about the gun barrels at issue or the parties' dispute generally.  This fact-based inquiry is best left to the province of the jury.

In sum, the Court denies the parties' cross-motions for summary judgment on Plaintiffs' Count XV against SCI for defamation by implication, but grants summary judgment to Defendants on Count XIII for defamation against SCI and Count XIV for defamation *per se* against SCI.  There remain five statements contained in four SCI publications that Plaintiffs allege as the basis for liability in a defamation by implication action: (1) the Open Letter; (2) that Plaintiffs misled third-party customers about gun-barrel issues; (3) that Plaintiffs' gun-barrel testing methods and mechanisms were faulty; (4) that Plaintiffs' gun-barrel heat treaters were uncertified; and (5) that others may want to look into Plaintiff Shay Horowitz's history.[8]  Whether these publications rise to the level of defamation by implication is a fact-based inquiry left to a jury at trial; a jury must decide whether, in publishing these statements, SCI created a defamatory implication by omitting certain facts or if SCI juxtaposed a series of facts so as to imply a defamatory connection between them.  *See Jews for Jesus*, 997 So. 2d at 1106-07.  Summary judgment on Count XV is therefore denied.

---

[8] Only the Open Letter remains as a potential basis for liability in Plaintiffs' Count XII for defamation by implication against KKM, while there are four potential bases for liability in Plaintiffs' Count XV against SCI.  This is because KKM authored the Open Letter which SCI subsequently published; however, SCI, and not KKM, published the three additional statements at issue in Count XV.  Because KKM neither authored nor published the three additional statements at issue in Count XV, these statements cannot be the basis for KKM's liability in Count XII.

**D.      Commercial Disparagement Claims (Counts XXII, XXIII, XXVI, XXVII)**

Commercial disparagement actions belong to a group of torts recognized in Florida under the collective title of "injurious falsehoods" and are often interchangeably known as slander of title or disparagement of property.  *Old Plantation Corp. v. Maule Indus., Inc.*, 68 So. 2d 180, 181 (Fla. 1953); *Procacci v. Zacco*, 402 So. 2d 425, 426 (Fla. 4th DCA 1981).  The crux of the tort of commercial disparagement is the intentional interference with another's economic relations. *Zacco*, 402 So. 2d at 426.  To establish a claim for commercial disparagement, a plaintiff must prove (1) a falsehood; (2) published or communicated to a third party; (3) where the defendant knows or reasonably should have known that it will likely result in inducing others not to deal with the plaintiff; and (4) in fact, the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and (5) special damages proximately caused as a result of the published falsehood.  *Bothmann v. Harrington*, 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984).

Plaintiffs' final two counts are for civil conspiracy to commit commercial disparagement. The elements of a civil conspiracy claim are: (1) a conspiracy between two or more parties; (2) to do an unlawful act (in this case, commit commercial disparagement); (3) the doing of some overt act in furtherance of the conspiracy; and (4) damage to plaintiff as a result of the acts performed in furtherance of the conspiracy.  *Bond v. Koscot Interplanetary, Inc.*, 246 So. 2d 631, 635 (Fla. 4th DCA 1971).

Plaintiffs' commercial disparagement counts are barred, and summary judgment is granted for Defendants on these counts, because of Florida's single publication doctrine.  Under Florida law, "a single publication gives rise to a single cause of action."  *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002); *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014).  The single publication doctrine precludes a plaintiff from asserting multiple causes of action where they arise from the same publication upon

which plaintiff's defamation claim is based. *Callaway*, 831 So. 2d at 208. "When claims are based on analogous underlying facts and the causes of action are intended to compensate for the same alleged harm, a plaintiff may not proceed on multiple counts for what is essentially the same defamatory publication or event." *Klayman*, 22 F. Supp. 3d at 1256.

Plaintiffs' commercial disparagement claims against KKM (Counts XXII and XXVI) are based on the same underlying facts as Plaintiffs' defamation claims against KKM (Counts X, XI, and XII). Plaintiffs allege in both sets of claims that the Open Letter defamed and disparaged them, and that they suffered harm as a result. Similarly, Plaintiffs' commercial disparagement claims against SCI (Counts XXIII and XXVII) are based on the same underlying facts as Plaintiffs' defamation claims against SCI (Counts XIII, XIV, and XV). In those claims, Plaintiffs allege that statements published by SCI (including the statements regarding Plaintiff's heat-treaters, gun-testing methods, and customer service) defamed and disparaged them in the conduct of their business, and that they suffered harm as a result. Indeed, the allegations supporting both the defamation claims and the commercial disparagement claims in Plaintiffs' Amended Complaint are nearly word-for-word identical,[9] which demonstrates the similarity between both sets of claims. Because both sets of claims are based on analogous underlying facts, and because both sets of claims seek to compensate Plaintiffs for the same underlying publication or publications, Plaintiffs may not proceed on both the commercial disparagement counts and the defamation counts. *See id.* (holding that counts for tortious interference with business relations and emotional distress were barred under Florida's single publication doctrine because they were based on the same facts as plaintiff's defamation claim). Additionally, because the Court has held that certain statements published by SCI are not defamatory and therefore cannot support any of Plaintiffs'

---

[9] The exhibits cited in support of both sets of claims are also identical.

defamation claims, these statements cannot now be the basis of a commercial disparagement action, in part because the statements are not defamatory.  Moreover, Plaintiffs' have not proven any special damages as is required in a commercial disparagement action.  *See Harrington*, 458 So. 2d at 1168.  Summary judgment for Defendants on Plaintiffs' commercial disparagement claims is therefore granted.

Accordingly, and for the reasons stated herein, it is hereby,

**ORDERED** that:

1.  Plaintiffs' Motion for Partial Summary Judgment [DE 109] is **DENIED**.

2.  Defendants' Joint Motion for Summary Judgment [DE 112] is **GRANTED in part**:

    a.  Summary Judgment is entered for Defendants on Plaintiffs' Count II, VI, IX, X, XI, XIII, XIV, XXII, XXIII, XXVI, and XXVII.

    b.  Summary Judgment is entered for Defendant SCI only on Plaintiffs' Count III and Count IV.

    c.  Summary Judgment is entered for Defendant KKM only on Plaintiffs' Count VII and Count VIII.

    d.  Summary Judgment on Plaintiffs' Count I, XII, XV is **DENIED**.

    e.  Summary Judgment on Plaintiffs' Count III and IV as to Defendant KKM is **DENIED**.

    f.  Summary Judgment on Plaintiffs' Count VII and Count VIII as to Defendant SCI is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida on this 6th day of December, 2023.

**RODNEY SMITH**
**UNITED STATES DISTRICT JUDGE**

cc:    All Counsel of Record